A03A0748. CHERRY et al. v. SCHWINDT et al.

(584 SE2d 673)

ADAMS, Judge.

In this medical malpractice case arising out of Thomas W. Cherry's death, the jury returned a verdict in favor of the physicians and their professional corporation. Molly Smith Cherry, Mr. Cherry's representative, now appeals, enumerating as error one evidentiary ruling and one jury charge ruling. Because we find no error, we affirm.

Mr. Cherry died from a heart condition called aortic dissection. During his care over the course of almost six days, Mr. Cherry was treated by several doctors, including cardiologists Dr. Richard Schwindt and Dr. Stephen Ross Cherry, through their professional corporation Cardiovascular Disease Specialist, P.C. The primary issue at trial was whether Dr. Schwindt and Dr. Cherry were negligent because they failed to diagnose Mr. Cherry's condition. Dr. Lawrence S. Cohen of the Yale University School of Medicine — author of a chapter entitled "The Disease of the Aorta" in Cecil's Textbook of Medicine, a widely recognized textbook within the medical community — testified as an expert on behalf of Mr. Cherry. Dr. John Douglas testified as an expert cardiologist on behalf of the defendant cardiologists.

Both Dr. Schwindt and Dr. Cherry testified that aortic dissection was contained in their differential diagnosis when they each became involved in Mr. Cherry's care. Both defendants and both experts testified that a differential diagnosis is a list of possibilities that a physician comes up with when presented with a clinical picture. Based on Mr. Cherry's original symptoms, the differential diagnosis for Mr. Cherry included toothache, myocardial infarction, myocardial ischemia, unstable angina, esophageal problems, gall stones, pulmonary embolus, aortic dissection, stomach ulcer, pneumonia, pneumothorax, pericarditis, mediastinosis, esophageal rupture or disease, atypical migraine, and ruptured diaphragm.

Both defendants and both experts agreed that physicians cannot run tests or studies to rule out every possible condition contained in the differential diagnosis. Instead, physicians begin a series of diag-

nostic tests designed to rule out the more likely possibilities. Physicians then work through this process continually assessing the results of tests and determining what additional tests are indicated until they discover the actual problem. Evidence was presented to show that Dr. Schwindt and Dr. Cherry, as well as other specialists involved with Mr. Cherry's care, were doing that up until the point that Mr. Cherry died.

The primary allegation of professional negligence made by Dr. Cohen was that Dr. Schwindt and Dr. Cherry missed clear signs and symptoms that were evident upon Mr. Cherry's initial presentation to the emergency room, or by day two, of an ongoing aortic dissection, and that therefore they failed to order certain tests that would have led to the correct diagnosis. But the evidence was conflicting, with plenty favoring the defendant doctors, regarding whether Dr. Schwindt and Dr. Cherry pursued the diagnostic process skillfully. Most importantly, Mr. Cherry's expert conceded on the stand that according to his own chapter dealing with the aorta, most of the clinical manifestations of aortic dissection were not present in Mr. Cherry's case: Mr. Cherry did not present with perhaps as many as 15 of 17 indications of aortic dissection listed in Cecil's Textbook. In addition, Mr. Cherry had symptoms that were inconsistent with those normally associated with aortic dissection and more commonly expected with other maladies identified in the differential diagnosis.

There was also a conflict of opinion regarding whether Mr. Cherry's aortic dissection was ongoing for several days, or whether it occurred near the end of Mr. Cherry's life and therefore would not have shown up on standard tests. The aorta is comprised of three separate layers, the innermost of which is known as the "intima." Typically, an aortic dissection begins when the intima tears, which in turn causes the aorta to rupture; however, there is a subcategory of aortic dissection in which the intimal tear is not initially identified. In those cases, the aortic dissection begins as an intramural, or subintimal, hematoma that can suddenly result in an aortic dissection.

Dr. Schwindt, Dr. Cherry, and Dr. Douglas believe that Mr. Cherry's aortic dissection was the intramural type and that the actual dissection occurred suddenly on the day Mr. Cherry died. Therefore, standard tests for aortic dissection would not have revealed the problem. Accordingly, they argued, the fact that they did not ask a neurosurgeon — who had ordered an angiography for the purpose of attempting to rule out a life-threatening neurological condition — to include a more comprehensive angiography that might have shown a typical aortic dissection did not affect Mr. Cherry's care. However, Dr. Gerald T. Gowitt, the Chief Medical Examiner of DeKalb County, performed the autopsy and testified that Mr. Cherry's aortic dissection had been ongoing for three or four

days plus or minus one day. But on cross-examination, Dr. Gowitt admitted that at the time of the autopsy he was unfamiliar with the intramural type of aortic dissection. And even based on his opinion, the dissection had not occurred at the time that Mr. Cherry first appeared at the hospital.

The jury resolved these and other issues in favor of the defendants, and this appeal was taken.

1. After Mr. Cherry died, Dr. Cherry called the radiologist who had performed the angiography requested by the neurosurgeon and asked whether the patient had an aortic dissection. On redirect examination, the court allowed Dr. Schwindt to testify over objection about Dr. Cherry's motivation in asking the question. In his answer, Dr. Schwindt also testified about how the radiologist, who did not testify, would have performed the angiography. The answer to the first question suggested that Dr. Cherry had motivations other than a concern that he had missed a diagnosis. The answer to the second question suggested that even though the radiologist did not film the area where the aortic dissection occurred, the radiologist may have seen the area during the angiography. Ms. Cherry contends that the court should have refused to allow testimony on either point.

First, although the plaintiff's attorney objected to Dr. Schwindt testifying about Dr. Cherry's motivation, he did not object to the testimony about how the radiologist would have performed the procedure. Accordingly, the second aspect of this enumeration of error presents nothing for us to review. *Jackson v. State*, 217 Ga. App. 485, 488 (4) (a) (458 SE2d 153) (1995).

Second, Dr. Cherry later testified without objection about why he asked the radiologist whether he had seen an aortic dissection. Therefore, because the same facts were proved by properly admissible evidence, any possible error was harmless. *Scott v. State*, 243 Ga. App. 383, 386 (2) (532 SE2d 141) (2000).

2. Ms. Cherry contends that the trial court improperly charged the jury with the hindsight charge. The court charged the jury as follows:

> In a medical malpractice action, a defendant cannot be found negligent on the basis of an assessment of a patient's condition which only later, or in hindsight, proved to be incorrect, as long as the initial assessment was made in accordance with the then reasonable standards of medical care. In other words, negligence consists in not foreseeing and guarding against that which is probable and likely to happen, not against that which is only remotely and slightly possible.

In a medical malpractice case, a hindsight charge is authorized "where the evidence raises an issue as to whether the negligence claim is based on later acquired knowledge or information not known or reasonably available to the defendant physician at the time the medical care was rendered." (Citations and punctuation omitted.) *Bethea v. Coralli*, 248 Ga. App. 853, 855 (2) (546 SE2d 542) (2001).

Ms. Cherry's expert witness Dr. Cohen testified that because aortic dissection was included in the differential diagnosis, it was below the standard of care not to perform a test to rule out that diagnosis. Ms. Cherry argues that because the defendant doctors included the condition in their initial differential diagnosis, Mr. Cherry died of a condition contemplated in foresight, not hindsight.

But according to this reasoning, the defendant doctors' performance would be below the standard of care unless they immediately performed all the tests known to diagnose each and every malady contained in the initial differential diagnosis (in this case there were 14). Yet, Dr. Cohen himself admitted that a physician orders tests based on his clinical suspicions and that he forms those suspicions based on the patient's clinical presentation and subsequent clinical findings. He specifically stated, "[the] patient's history and clinical presentation drives the diagnostic engine to determine what the physician is going to get in terms of tests." And, "the physician rules in and rules out certain conditions depending upon what seems most likely." He agreed that if the patient does not present with an indication of the condition, you do not run the test.

In this case, the evidence was disputed about whether aortic dissection was even close to being the most likely diagnosis based on Mr. Cherry's presenting symptoms. As shown above, he did not present most of the symptoms described in Cecil's Textbook. And Mr. Cherry's symptoms suggested more strongly, especially as they developed, other maladies identified in the differential diagnosis — namely, myocardial infarction (heart attack) and unstable angina with myocardial ischemia (acute heart pain due to poor blood flow) — and two neurological conditions — cerebral aneurism and subarachnoid hemorrhage. The doctors pursued these leads with appropriate tests.

Thus, the primary issue in this case was whether the cardiologists should have decided to order tests for aortic dissection at some point prior to Mr. Cherry's death. But there was evidence to show that for the entire time that Mr. Cherry was being treated, several doctors including Dr. Schwindt and Dr. Cherry were pursuing a course of trying to diagnose Mr. Cherry's condition. There was also an issue of fact as to whether Mr. Cherry's aortic dissection had begun when he arrived at the hospital or occurred only shortly before his death. In the words of the hindsight charge itself, at a minimum, there was an issue of fact about whether, upon initial presentment,

Mr. Cherry's aortic dissection was something that was "probable and likely" or something that was only "remotely and slightly possible." A charge is appropriate "where there is any evidence, however slight, on which to predicate it." (Citations and punctuation omitted.) *Brown v. Sims*, 174 Ga. App. 243, 244 (329 SE2d 523) (1985). In this case, the evidence raised an issue about whether the defendant doctors had sufficient indication, in the form of Mr. Cherry's presenting symptoms, that aortic dissection was one of the most likely possibilities, thereby requiring immediate testing in lieu of pursuing other leads. Accordingly, the hindsight charge was appropriate. See generally *Mercker v. Abend*, 260 Ga. App. 836 (581 SE2d 351) (2003).

*Judgment affirmed. Andrews, P. J., and Eldridge, J., concur. Barnes, J., disqualified.*

DECIDED JUNE 27, 2003.

*Knight, Fisher & Mills, Roger Mills*, for appellants.
*Willis, McKenzie & Long, Charles J. Willis*, for appellees.