A03A1938, A03A1939. TENSAR EARTH TECHNOLOGIES, INC.
et al. v. CITY OF ATLANTA; and vice versa.

(598 SE2d 815)

PHIPPS, Judge.

This case arose from a wrongful death action filed by the estate of Viktorya Vaynshteyn[1] against Tensar Earth Technologies, Inc. and its parent company, the Tensar Corporation (collectively Tensar Companies), the City of Atlanta (City), and several other defendants. All defendants except the Tensar Companies settled. In 1996, a trial was held on the estate's claims against the Tensar Companies and on a cross-claim asserted by the City against the Tensar Companies for contribution. A jury found in favor of the Tensar Companies, but the court granted a new trial. The Tensar Companies settled with the estate, and in 1997, the case proceeded on the City's contribution claim. The City asserted that the Tensar Companies were liable to the estate under theories of negligence and products liability. The Tensar Companies were denied summary judgment, and the case went to trial. A jury found in favor of the City, and the trial court entered judgment on the jury's verdict and then calculated an award for the City.

All parties appeal. The Tensar Companies' appeal, Case No. A03A1938, and the City's cross-appeal, Case No. A03A1939, are consolidated in this opinion. Because the record demonstrates that the trial court erroneously excluded evidence and deprived the Tensar Companies of one of its defenses, in Case No. A03A1938, we reverse the judgment entered upon the jury's verdict, vacate the City's award, and remand the case for proceedings not inconsistent with this opinion. We dismiss Case No. A03A1939, as that case appeals the City's award.

The following evidence was adduced at trial. In 1988, Marriott Hotels, Inc. hired Sain South, a civil engineering firm, to provide site designs for a Marriott Courtyard hotel that it was planning to construct on 14th Street in Atlanta. Sain discovered that a combined sanitary and storm sewer, approximately 11 feet in diameter, crossed underneath a section of the property. Because of concerns about the structural integrity of that portion of the sewer, Marriott and Sain agreed that a reinforcing safety net (geogrid) would be installed in the soil above the sewer and below what would become the hotel parking lot. Mark Gonzalez, then a Sain project manager on the project, testified, "the geogrid safety net was to support the parking lot for a period of time should some void . . . below the parking lot open up,

---

[1] Vaynshteyn's husband and child were also plaintiffs.

creating a lack of soil support beneath the parking lot or the area that ... was [a]ffected." And if a void developed, Gonzalez explained, there would be "significant deflections in the parking lot curb, movement of retaining wall, things of that nature which would express themselves at the surface." The completed Sain site drawings incorporated the use of a geogrid.

Robert Anderson, a professional geo-technical engineer employed by Tensar Earth Technologies, testified that around January 1990, he was asked "by our sales organization" to "provide an alternative design to this so-called safety net" contemplated by the Sain site drawings. He had known that there were concerns about the structural integrity of the sewer and that the sewer's diameter was approximately 11 or 12 feet. Anderson had understood that purposes of a geogrid included: "to bridge or span some void for some amount of period of time to allow the authorities, be they the Marriott or whoever, to have adequate notice to barricade off the area and then go in and repair it because — serve warning of a problem" and "to hold up the parking lot if the sewer collapsed." He had envisioned a "collapse" as either a "complete structural cave-in of the sewer, or voids building up and the soil above or around the sewer eventually enlarging to some point where the surface would then tend to collapse. Not necessarily that the masonry and the sewer all came crashing down."

Anderson and others at his company designed a geogrid. Anderson testified that a critical step in designing the geogrid was estimating the size to which a void might grow. And that estimation was made by him. He used a void size of 20 feet in his calculation, assuming that size was a reasonable estimate. He explained that in case of "an instantaneous collapse that's exactly 20 feet in diameter and is a perfect circle," the geogrid would support the parking lot for about four days while the parking lot increasingly sagged to about four feet during that time.

Tensar submitted its initial design for a geogrid and was asked to cut its price. The product was made less expensive by adding various "efficiencies" in the design. Anderson explained, "At the time of the original design, I had two pieces of paper which gave me an idea of ... a competitive design shown on the plans, what it was all about." By the time Tensar was asked to cut its price, Anderson testified, "I could do a proper design, and that proper design was a far more efficient use of grid than I had assumed on the original design so I was able to use less grid." In addition, the second version was designed to support less weight than the initial version. After Tensar answered various technical questions from Sain, Sain approved the use of Tensar's geogrid in the project. The end product was referred to as the Tensar

Geogrid Safety Net (Tensar Geogrid). In 1990, 3-D Excavators, Inc. installed the Tensar Geogrid into the soil. Construction of the hotel was completed.

In May 1993, Gary Grantham, a Marriott Courtyard engineering manager, noticed that cracks had developed in the parking lot and in the retaining wall of the parking lot and that a stairway leading from the first level of the parking lot to its second level had begun separating from its support wall. He also saw concrete "spalling off or near an expansion joint of the lower end of the retaining wall." At that time, Grantham was unaware of the underlying sewer and geogrid.

On June 10, 1993, Grantham saw other conditions in the parking lot. The stairway had separated farther from its support wall; the cracks in the parking lot were larger; a manhole had "pull[ed] away rather significantly from its surrounding asphalt"; and a depression of three to six feet had developed in the parking lot. That day, Grantham met with a project manager of 3-D Excavators, who told him that a sewer ran under the property, that it was old, and that reinforcement had been installed in the soil to work as a "bridge" to support the parking lot in case of a problem with the sewer. The project manager entered the sewer, inspected it, and then informed Grantham that there might be some problems with the sewer and that he should call the City, which Grantham did.

That same day, Tyler Kane and James Walker, City employees, entered the sewer to inspect it. Kane determined that the sewer needed "emergency repair." He contacted a contractor, who could not come to the site until the following Monday, June 14. Kane "thought that would be okay." Walker also concluded, based on his observations, that the situation with the sewer was "an emergency." In a memorandum, dated June 11, 1993, to the Coordinator of the City's Contracts, Grants & Assessments Department requesting monies for the repair, Walker stated, "[t]he present condition of this sewer may lead to an immediate and total collapse of the structure from 14th Street south to the Marriott parking lot." Meanwhile, Grantham barricaded areas of the parking lot as suggested by a City employee, as well as some extra parking areas.

Between 3:00 and 4:00 a.m. on Monday, June 14, a hotel security employee noticed that a hole about the size of a manhole had developed in the parking lot near the stairway. At about 5:30 a.m., the employee saw that the hole had grown larger and that the stairway had separated from the retaining wall by about two or three feet. He reported these observations to no one.

Sometime later that morning, Vaynshteyn arrived for work. Her body was later discovered in her automobile at the bottom of a hole, approximately 100-feet by 100-feet, in the parking lot. Vaynshteyn had drowned.

Anderson defended the design and effectiveness of the Tensar Geogrid. He described the geogrid as "an on-going warning system" and testified that the geogrid had warned of growing voids through manifestations in the parking lot that had, in fact, led to the City and Marriott discovering that the sewer was in need of immediate repair. He insisted that the geogrid had "held up for some period of time" and stated "[the Tensar Geogrid] wasn't intended to work out there forever. This was a temporary warning system."

Further defending the Tensar Geogrid, Anderson testified that he had considered, as a "worst-possible situation," that the sewer would collapse suddenly. In designing the geogrid, he had anticipated that, if that occurred, a single column of soil would fall down into the void. What Anderson had not anticipated, however, was that approximately ten feet of flowing water inside the sewer would wash away that single column of soil, allowing more soil to fall into the void and then wash away, causing the void to grow dramatically. Nor had Anderson taken into account the effects of a void that grew larger than 20 feet. Anderson admitted that, if the void grew "outside the range that we were protecting, [the Tensar Geogrid] would not function as designed." He testified that had he considered the effects of water flowing through the sewer, "[the Tensar Geogrid] wouldn't be designed the way it was designed." The City's expert testified that the Tensar Geogrid design was deficient.

## Case No. A03A1938

1. The Tensar Companies contend that the trial court erred in denying them summary judgment. "An appellate court, however, will not review the denial of a motion for summary judgment following a trial on the merits."[2]

2. The Tensar Companies contend that the trial court erred in granting the City's motion in limine excluding certain evidence and in depriving them of their defense that intervening acts and omissions by the City and Marriott constituted the only proximate causes of Vaynshteyn's death.

"The admission of evidence, including a ruling on a motion in limine, is a matter resting within the sound discretion of the trial court, and we will not disturb the exercise of that discretion absent evidence of its abuse."[3] "[T]he Georgia rule favors the admission of any relevant evidence, no matter how slight its probative value.

[2] *Acuff v. Proctor*, 267 Ga. 85, 86 (5) (475 SE2d 616) (1996).

[3] (Footnote omitted.) *Stewart v. Lanier Park Med. Office Bldg.*, 259 Ga. App. 898, 901 (3) (578 SE2d 572) (2003).

Evidence of doubtful relevancy or competency should be admitted and its weight left to the jurors."[4]

The Tensar Companies sought to ask Kane what he had observed during a City inspection of the sewer line underneath the parking lot in January 1993. The Tensar Companies also sought to show that, on June 10, 1993, Grantham overheard Walker express his concern to another City employee that the condition of the sewer was such that there might not be enough time to wait until the following Monday to repair the sewer. The Tensar Companies argue that the cited evidence imparted to the City and Marriott knowledge that problems with the sewer line had recently worsened to an emergency situation and it further showed that they had the authority and ability to abate the problem. The Tensar Companies argue that this and other evidence, along with proper jury charges and argument, would have authorized a jury to find that the City's and Marriott's failure to cordon the area and begin repairs immediately after being advised of the imminent collapse of the sewer were intervening superseding causes.

The trial court found the cited evidence irrelevant and determined that "[the Tensar Companies'] intervening cause defense is factually and legally unsupportable under the facts of this case. Evidence of intervening cause is irrelevant, prejudicial and would lead to confusion of the issues." The trial court thus prohibited "argument regarding [the Tensar Companies'] intervening or superseding cause defense" and refused to charge the jury on intervening, superseding acts.

An intervening act may become the sole proximate cause of a plaintiff's injuries.

> [T]he general rule is that if, subsequently to an original wrongful act, a new cause has intervened, of itself sufficient to stand as the cause of the misfortune, the former must be considered as too remote, still if the character of the intervening act claimed to break the connection between the original wrongful act and the subsequent injury was such that its probable or natural consequences could reasonably have been anticipated, apprehended, or foreseen by the original wrong-doer, the causal connection is not broken, and the original wrong-doer is responsible for all of the consequences resulting from the intervening act.[5]

---

[4] (Citation omitted.) *Cornelius v. Macon-Bibb County Hosp. Auth.*, 243 Ga. App. 480, 487 (5) (533 SE2d 420) (2000).

[5] (Citation and punctuation omitted.) *Ontario Sewing Machine Co. v. Smith*, 275 Ga. 683, 686 (2) (572 SE2d 533) (2002).

Questions regarding proximate cause are "undeniably a jury question" and may only be determined by the courts "in plain and undisputed cases."[6]

In *Ontario Sewing Machine Co. v. Smith*,[7] an employee of Wilen Mop Manufacturing was injured when a machine manufactured by Ontario Sewing Machine Company activated without warning.[8] Before that day, Ontario had sent Wilen a recall notice, instructing it to stop using the machine and setting forth the terms of the recall.[9] In the ensuing products liability action by the injured employee against Ontario, the trial court granted summary judgment to Ontario on the ground that Wilen's failure to stop using the defective machine after the voluntary recall was the sole proximate cause of the employee's injury.[10] The Supreme Court of Georgia determined that jury questions were presented regarding the reasonableness of the recall and the foreseeability of whether Wilen would comply with it.[11] Thus, it reversed the trial court's ruling, because it was not plain and undisputed whether Ontario's defective machine was the proximate cause of the employee's injuries.[12]

In the instant case, it was not plain and undisputed that the Tensar Companies' acts were the proximate causes of Vaynshteyn's death. The City counters that no act or omission by it or Marriott broke the connection between the Tensar Companies' wrongful acts of negligently designing and manufacturing the Tensar Geogrid and Vaynshteyn's death. It asserts that, because a collapse of the sewer line was precisely one of the dangers anticipated and guarded against by the Tensar Geogrid, the Tensar Companies unquestionably foresaw that death would be a result from a failure of its geogrid. Furthermore, the City points out, there was never any sag of four feet in the parking lot that lasted four days that would have served as protection and/or warning.

Notwithstanding, the mere installation of the Tensar Geogrid did not, in and of itself, render irrelevant subsequent acts and omissions by the City and Marriott. According to testimony by

---

[6] (Punctuation and footnote omitted.) Id. at 687.
[7] Supra.
[8] Id. at 684 (1).
[9] Id.
[10] Id.
[11] Id. at 687.
[12] Id.

Gonzalez and Anderson, in addition to protecting against an instantaneous collapse, the Tensar Geogrid was designed to support the parking lot in case of growing voids for a temporary period, during which period changes above the surface would signal that immediate repair was needed. And there was evidence that changes in the parking lot did lead to the Marriott contacting the City, which investigated the sewer line just days before Vaynshteyn's death and determined that the sewer needed "emergency repair." The excluded evidence was relevant on pertinent issues regarding whether the City and Marriott knew that they were facing an emergency situation and failed to take appropriate action.

Whether the changes in the parking lot reflected protection and warning from the Tensar Geogrid, whether the City and Marriott reasonably responded to the warning, and if not, whether the Tensar Companies could have foreseen that the City and Marriott, after being alerted to the fact that the sewer line underneath the property was in need of emergency repair, would not immediately barricade the parking area and/or begin repair, are all questions for a jury. The trial court thus abused its discretion in excluding the cited evidence and argument related to the Tensar Companies' defense that intervening acts of others broke the connection between their wrongful acts, if any, and Vaynshteyn's death.[13] As we are unable to find the erroneous exclusions harmless, the judgment entered upon the jury's verdict is reversed and the trial court's award is vacated. We remand this case for proceedings not inconsistent with this opinion. We address the remaining claims of error that are likely to recur at retrial.

3. The Tensar Companies contend that the trial court erred in excluding expert testimony to support its claim that they had not breached their duty as a "substitute materials supplier" or "substitute product seller." They point out that Marriott and Sain had already decided to use a geogrid and assert that they were "merely attempting to design a net that satisfied the previously approved criteria shown on [Sain's] site drawings." Based on that characterization of their role, they argue that they should have been allowed to present testimony by an expert regarding the standard of care of professional engineers who were merely "substitute material suppliers" or "substitute product sellers." The trial court ruled that "the 'Substitute Material Supplier' and 'Substitute Product Seller' defenses are legally and factually unsupportable, and the allowance of argument and evidence concerning same would be prejudicial and confusing to the jury."

---

[13] See id.

The Tensar Companies' claim that they served only as a "substitute materials supplier" or "substitute product seller" is not supported by the record. Anderson, Tensar Earth Technologies' professional geo-technical engineer, testified that he (and others) in his company designed the geogrid, that a critical factor in designing the geogrid was selecting a void size to be used in the calculations, that selecting that void size had been his responsibility, that he decided to base the Tensar Geogrid upon a void size of 20 feet, that he did the "basic calculations" for the geogrid, that the Tensar Geogrid had not been designed for voids larger than 20 feet, and that, when a price reduction was requested, he redesigned the Tensar Geogrid to support less weight. Under these circumstances, we find no factual support for the Tensar Companies' assertion that they served as a mere "substitute materials supplier" or a "substitute product seller." Accordingly, we find no error in the trial court's ruling on this matter.

4. The Tensar Companies also challenge the exclusion of other evidence, arguing that the evidence would have further established that the City and Marriott knew early on about the sewer running underneath the property and the problems associated with it. They cite evidence showing that the City issued a permit for the construction of the parking lot and the drawings submitted to it showed a reinforcing grid. They also cite testimony by James Berryman and redacted portions of a report by a City employee. Berryman had been a real estate broker working for the Marriott Corporation developing its Courtyard by Marriott Program until about 1988. Berryman would have testified that in 1985 or 1986, Marriott halted its plans to build a hotel at the site because of concerns related to the underlying sewer line. And the redacted portions of the report, dated 1984, concerned whether the sewer line could withstand vibrations and loads associated with overhead or adjacent construction activities.

As this evidence is cumulative of other undisputed evidence establishing that the City and Marriott knew early on of the condition of the sewer, we find no abuse of discretion in the trial court's exclusion of it.[14] In addition, the Tensar Companies have not demonstrated how the issuance of the permit affected their liability, and Anderson testified that the City played no role in designing the geogrid.[15]

5. The Tensar Companies contend that the trial court erred by denying their motion for directed verdict on the products liability claim.

---

[14] See *Flournoy v. Goble*, 256 Ga. App. 722, 724 (1) (569 SE2d 861) (2002).
[15] See generally *Fulton County v. Wheaton*, 252 Ga. 49, 50 (1) (310 SE2d 910) (1984).

In determining whether a trial court erred in denying a motion for a directed verdict, we construe the evidence and any doubts or ambiguities in favor of the verdict. A directed verdict is not authorized unless there is no conflict in the evidence on any material issue and the evidence introduced, with all reasonable deductions, demands a certain verdict.[16]

(a) The Tensar Companies argue that they could not have been found liable to the estate under a theory of products liability, asserting that their liability, if any, was based only on professional engineering negligence. Relying on *Seely v. Loyd H. Johnson Constr. Co.*,[17] they assert that the Tensar Geogrid cannot be considered a "product" under a theory of products liability because it had been installed in the ground and thus became a "component of a specially designed system."

Under Georgia's product liability statute,

The manufacturer of any personal property sold as new property . . . shall be liable in tort . . . to any natural person who may use, consume, or reasonably be affected by the property and who suffers injury to his person or property because the property when sold by the manufacturer was not merchantable and reasonably suited to the use intended, and its condition when sold is the proximate cause of the injury sustained.[18]

The Tensar Companies reliance on *Seely* is misplaced, as that case concerned alleged negligent installation and repair of water pipes in a house. "It [did] not involve the manufacture of defective personal property."[19] Unlike *Seely*, the instant case did concern the manufacture of personal property — the Tensar Geogrid. Furthermore, in *Garrett v. Panacon Corp.*,[20] this court held that the manufacturer of allegedly defective roofing materials used in the construction of a plant could be held liable under a products liability theory to a plant employee who slipped on water that had leaked through the roof that incorporated its product.[21] This court instructed, "it matters

---

[16] (Citations and punctuation omitted.) *Scott Bros., Inc. v. Warren*, 261 Ga. App. 285, 287 (3) (582 SE2d 224) (2003).

[17] 220 Ga. App. 719 (470 SE2d 283) (1996).

[18] OCGA § 51-1-11 (b) (1).

[19] *Seely*, supra at 723 (2).

[20] 130 Ga. App. 641 (204 SE2d 354) (1974).

[21] Id. at 642-645.

not at all" that the defective material has been subsequently installed in a building.[22]

(b) The Tensar Companies argue that there was no evidence that the Tensar Geogrid was defective. While there was evidence that would have authorized a jury to find that the Tensar Geogrid gave protection and warning of voids developing, there was also evidence authorizing a jury to find that the Tensar Geogrid failed to protect and give warning because it had been designed and thereafter manufactured without taking into account critical factors that would have reduced, if not eradicated, its effectiveness. As there was evidence that the Tensar Geogrid was not reasonably suited for its intended purposes, the trial court did not err in denying the Tensar Companies' motion for directed verdict on the theory of products liability.

6. The Tensar Companies contend that the trial court erred in denying their motion for directed verdict on the ground that they could not be considered joint tortfeasors. The Tensar Companies cite language from *Gilson v. Mitchell*,[23] "[J]oint participants in the creation of a nuisance are not jointly and severally liable for the full total of plaintiff[s'] damages, but only for their individual parts."

The City's claim for contribution was not based on any allegation that it and the Tensar Companies were "joint participants in the creation of a nuisance." Rather, liability against the Tensar Companies was based on negligence and products liability; liability against the City was based on maintaining a nuisance.[24] And there was evidence that acts and omissions by the Tensar Companies and the City, showing liability under the respective theories, combined to cause a single injury, Vaynshteyn's death. Under these circumstances, the Tensar Companies can be considered joint tortfeasors with the City for purposes of contribution.[25] The trial court did not err in denying the Tensar Companies' motion for directed verdict on this ground.

7. The Tensar Companies make several claims of error challenging the court's charge to the jury on the ground that the trial court refused to charge the jury on various issues, that the trial court refused to use certain of its language, or that the trial court gave instructions that were not pattern jury charges. It is axiomatic that a jury charge is appropriate "where there is any evidence, however

[22] Id. at 645.

[23] 131 Ga. App. 321, 328 (205 SE2d 421) (1974) (emphasis omitted).

[24] See *City of Fairburn v. Cook*, 188 Ga. App. 58, 65 (6) (372 SE2d 245) (1988) (municipal corporation may be liable for damages it caused to a third party for maintaining a nuisance).

[25] See *City of Atlanta v. MARTA*, 204 Ga. App. 387, 388-389 (1) (419 SE2d 330) (1992), rev'd on other grounds, 262 Ga. 743 (425 SE2d 862) (1993); *Parks v. Palmer*, 151 Ga. App. 468, 470-471 (2) (260 SE2d 493) (1979).

slight, on which to predicate it"[26] and that "where the charge given substantially covers the applicable principles, failure to give requested instructions in the exact language requested is not error."[27]

One of the Tensar Companies' challenges focuses on the charge given on proximate cause. They claim that the trial court erred in giving a charge on that issue that was not the pattern instruction, which is

> Proximate cause is that which, in the natural and continuous sequence, unbroken by other causes, produces an event, and without which the event would not have occurred. Proximate cause is that which is nearest in the order of responsible causes, as distinguished from remote, that which stands last in causation, not necessarily in time or place, but in causal relation.[28]

The record reveals that the court charged the jury, "Proximate cause is defined as that which in the natural and continuous sequence and without which the event would not have occurred." As that language in no way substantially covered the principles applicable to proximate cause, the court erred.

### Case No. A03A1939

8. The City appeals the trial court's order, contesting the amount of the award. As we have reversed the judgment entered upon the jury's verdict in Case No. A03A1938 and thus vacated the order appealed in this case, Case No. A03A1939 is dismissed as moot.

*Judgment reversed in Case No. A03A1938 and case remanded. Case No. A03A1939 dismissed. Blackburn, P. J., and Ellington, J., concur.*

DECIDED MARCH 30, 2004 —
RECONSIDERATIONS DENIED APRIL 14, 2004 — 

*Thomas & Kane, Stephen R. Kane, Freeman, Mathis & Gary, T. Bart Gary, Stuart W. Gray*, for appellants.

---

[26] (Citation and puntuation omitted.) *Cherry v. Schwindt*, 262 Ga. App. 48, 52 (2) (584 SE2d 673) (2003).

[27] (Citation and punctuation omitted.) *Dept. of Transp. v. Dalton Paving & Constr.*, 227 Ga. App. 207, 224 (10) (489 SE2d 329) (1997).

[28] Suggested Pattern Jury Instructions, Vol. I: Civil Cases, p. 231 (3rd ed. 1997).

*Phears & Moldovan, H. Wayne Phears, Jason L. Groch, Brian E. Daughdrill, Sarah I. Mills, Richard E. Harris*, for appellee.