**SECOND DIVISION**
**MILLER, P.J.,**
**RICKMAN and REESE, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**June 28, 2019**

# In the Court of Appeals of Georgia

A19A0108, A19A0109; SUZUKI MOTOR OF AMERICA, INC. et al. v. JOHNS et al.; and vice versa.

RICKMAN, Judge.

In this product liability action, a jury returned a verdict and awarded damages in favor of Adrian Johns and against Suzuki Motor Corporation ("SMC") and Suzuki Motor of America, Inc. ("SMAI") (collectively, "Suzuki") on Johns's claims for strict product liability based upon a design defect, breach of a continuing duty to warn, and negligent recall, stemming from injuries that he suffered when the front brakes on his Suzuki motorcycle failed. The jury also found in favor of Johns's wife and awarded her damages on a claim for loss of consortium. The jury attributed 49 percent fault to Johns and the remaining 51 percent fault to the collective defendants, and the trial court apportioned the damage award accordingly.

In Case Number A19A0108, Suzuki asserts that the trial court erred by failing to dismiss SMAI from the lawsuit on the basis that it did not assume liability for Johns's claims when it acquired the assets of its predecessor corporation in bankruptcy; failing to enter a directed verdict on each of Johns's three claims; and admitting irrelevant and unduly prejudicial evidence of a recall and evidence of other incidents for improper purposes. In Case Number A19A0109, the Johnses assert on cross-appeal that the trial court erred by apportioning the damage award on Johns's strict liability claim and on his wife's loss of consortium claim, which also resulted in the court declining to award pre-judgment interest pursuant to OCGA § 51-12-14 (a). For the following reasons, we affirm in both cases.

Viewed in the light most favorable to the jury's verdict,[1] the evidence shows that SMC is a Japanese corporation that designed and manufactured the motorcycle at issue in this lawsuit. SMAI is an American wholesale distributor and wholly-owned subsidiary of SMC, and although it did not distribute Johns's motorcycle, it acquired the assets of the wholly-owned SMC subsidiary that did through a Chapter 11 bankruptcy proceeding.

---

[1] See *Neal v. CSX Transp.*, 213 Ga. App. 707, 709 (2) (445 SE2d 766) (1994).

In 2005, Johns, who had been driving motorcycles for over 20 years, purchased a 2006 Suzuki GSX-R1000. On August 9, 2013, Johns was preparing for a weekend motorcycle ride and conducted a pre-ride inspection on his bike. His pre-ride inspections routinely included checking the tires, lights, fluids, and brakes. On this particular occasion, Johns noticed that the front brake felt "spongy." He called his father-in-law, a certified motorcycle mechanic, who, after inquiring about the brake fluid, instructed him to "bleed the brakes," a process that involved draining the air out of the brake line until a "tight brake" was achieved. Johns did so, and the problem appeared to be resolved. He nevertheless decided to forgo the longer weekend ride, instead limiting himself to short test drives. The front brake seemed to function normally.

The following Monday morning, August 12, 2013, Johns decided to drive the motorcycle to work. After doing his usual pre-ride inspection, he exited his neighborhood and drove approximately 20 miles without noticing any problem with his front brake. At some point, however, Johns was traveling at approximately 20 miles per hour on a highly-trafficked road when the tractor-trailer in front of him began to slow down. As Johns attempted to do the same, he experienced a total failure of his front brake. Boxed in by the cars around him, Johns was forced to rely entirely

on his rear brake, causing his motorcycle to skid and swerve, and he ultimately hit the curb and was thrown from his bike. Johns lost consciousness for a period of time and suffered serious injuries to his back and hand in the accident. He subsequently underwent spinal fusion surgery and a separate surgery to repair his hand, and spent over two months in the hospital and at rehabilitation facilities relearning how to walk and use his hand again.

While still in the hospital, Johns relayed to his father-in-law that the front brake on his motorcycle had failed. Johns's wife and father-in-law subsequently picked up the bike from the tow lot and confirmed that the front brake did not work.

Within a couple of days of returning home from rehabilitation, Johns received a recall notice from Suzuki warning him of a dangerous safety defect in his motorcycle's front brake master cylinder. The recall notice warned that a condition in the front brake master cylinder of GSX-R motorcycles may "lead to corrosion of the break piston" and result in a "spongy" brake. It further warned that "[o]perating your motorcycle without having the recall service performed may increase the risk of a crash." Johns testified that, had he received the recall notice before his accident, he would not have driven his motorcycle without first having had the service performed.

Johns filed the instant lawsuit against Suzuki, alleging claims of strict liability based upon a design defect, negligent failure to warn, and negligent recall; he sought both compensatory and punitive damages. Johns's wife also filed a claim for loss of consortium.

During the ensuing trial, Johns presented evidence in support of his theory that a defect in the design of his motorcycle's master cylinder caused the front brake failure, that the defect was the same defect as that targeted by Suzuki's subsequently issued recall, and that Suzuki had notice of the issue months before it notified the public and, indeed, prior to Johns's accident. As evidence of the defect, Johns presented testimony from an expert witness who testified that the design of the master cylinder resulted a steel spring being in direct contact with a zinc piston, and that it had been long understood that a combination of those metals in the presence of water, such as that commonly present in brake fluid, created a "galvanic couple" resulting in a corrosion of the piston. The expert testified that the corrosion produces various byproducts, including gas and zinc formate crystals, which can then interfere with normal brake operation. The expert also testified that the corrosion issue could be avoided by placing a rubber insulator between the two metals, as was done in the rear brake master cylinder of Johns's motorcycle.

5

After Johns's front brake was tested, disassembled, and inspected, the expert opined that the steel-zinc reaction in the front brake master cylinder did indeed create a corrosive byproduct that included gas and crystallized zinc formate, and that a zinc formate crystal disrupted a seal in the master cylinder which created a "leak path" which misdirected the flow of brake fluid and resulted in the total brake failure that Johns experienced.

In addition, Johns used evidence of the recall itself, as well as internal documents illustrating the circumstances surrounding the recall decision, as evidence not only of the defective design, but also of Suzuki's knowledge of the defect. Johns also presented evidence of two unrelated but similar incidents.

In its defense, Suzuki denied that any kind of malfunction of the motorcycle's front brake contributed to Johns's accident, instead asserting that the accident and resulting injuries were caused by Johns's negligent operation of the bike at the time of the accident. As an alternative theory, Suzuki contended that even if Johns did experience brake failure in the manner alleged by his expert witness, the corrosive condition existed only as a result of Johns's admitted failure to change the brake fluid for eight years in contravention of the owners manual's instruction that the fluid be replaced every two years. Suzuki also maintained throughout the trial that its master

cylinder recall was entirely unrelated to Johns's claims. Suzuki asserted that the defective condition targeted by the recall was the master cylinder's inability to purge gas produced as a byproduct of the corrosive piston, a condition which was exacerbated by Johns's failure to change the brake fluid, which resulted in increased moisture and, consequently, increased gas production. Suzuki contended that the defect would result in a "spongy" brake, but never in a total loss of a motorcycle's front brake.

The jury found in favor of Johns on each of his claims and awarded him $10.5 million in compensatory damages, but declined to award punitive damages. When asked to assign the relative percentages of fault to the parties, the jury assessed 49 percent fault to Johns, 45 percent fault to SMC, and 6 percent fault to SMAI. The jury also found in favor of Johns's wife on her claim for loss of consortium and awarded her an additional $2 million in damages. The trial court apportioned the damage award pursuant to OCGA § 51-12-33 in accordance with the percentage of fault attributed to each party. Suzuki filed a motion for judgment notwithstanding the verdict or, alternatively, for a new trial, which the trial court denied. This appeal follows.

*Case No. A19A0108*

7

1. SMAI asserts that this Court should enter judgment in its favor on all claims because it was never a proper party to this case. Prior to trial, the trial court granted summary judgment to SMAI on Johns's design defect claim after concluding that it was not a manufacturer for the purposes of that action, which was premised on strict liability; however, the trial court denied summary judgment to SMAI on the remaining two claims premised, in part, on successor liability. SMAI argues that it should have been dismissed from the lawsuit in its entirety because it "had nothing to do with the development, manufacture, distribution, or sale of Johns's motorcycle," since it did not begin operations until seven years after Johns purchased the motorcycle in question.

We need not even consider the substance of SMAI's argument because it simply is not possible at this point for this Court to unwind the jury's verdict as to any single defendant. In the charge given to the jury, the term "manufacturer" was not defined, and the charge referred to SMC and SMAI collectively as "manufacturers" and "defendants" throughout. Likewise, the verdict form, by express consent of the parties, did not distinguish between the "Defendants" when asking the jury to determine the liability associated with any claim.

Indeed, during the trial court's conference on the drafting of the verdict form, the trial court expressed concern about the challenges it faced because of the different parties and different claims. The following colloquy transpired:

THE COURT: [M]y fear is that we get . . . a verdict that's not a straight defense verdict, trying to figure out what the jury is telling me to put in a judgment . . . if I can't figure out what they mean, we've got a problem. So that is why I've taken so long in doing the verdict form.

. . . [DEFENSE]: We're happy to have the Court to just do one defendant.

. . .

[THE COURT]: . . . [Y]ou want me to combine the defendants here at the end of trial?

[DEFENSE]: Yes, your Honor, we do.

. . .

[PLAINTIFF]: I think its inviting error, Judge.

[DEFENSE]: Well, not if we consented to it.

[THE COURT]: Well, not if everybody consents to it.

9

[DEFENSE]: It seems like we're the ones that could claim error.

[THE COURT]: . . . I have no idea what the implications of it would be.

. . .

[PLAINTIFF]: That's fine with us.

. . .

[DEFENSE]: We are perfectly fine on that.

Under these circumstances, to the extent any liability was improperly assessed to SMAI, it was invited error. See generally *Jackson v. Neese*, 276 Ga. App. 724, 727 (4) (624 SE2d 139) (2005).

2. Suzuki contends that the trial court erred in denying its motion for directed verdict on each of Johns's claims.[2] A directed verdict is warranted only "[when] there is no conflict in the evidence as to any material issue, and the evidence introduced, with all reasonable deductions therefrom, shall demand a particular verdict." (Citation and punctuation omitted.) *Key Safety Systems, Inc. v. Bruner*, 334 Ga. App. 717, 717

---

[2] Suzuki also filed a motion notwithstanding the verdict on the same claims.

(780 SE2d 389) (2015). When reviewing a trial court's ruling on a motion for directed verdict, we construe the evidence most favorably to the party opposing the motion and will affirm the trial court's ruling if there is any evidence to support it. Id. at 717-718. We will address each claim in turn.

(a) SMC argues that it was entitled to a directed verdict on the design defect claim because it contends that Johns "materially altered" the motorcycle prior to his accident.[3] Although couched in terms of a material alteration, the crux of SMC's position is that Johns's admitted failure to replace the brake fluid acted as an intervening cause that broke the causal connection between its defective design and Johns's injuries.

Under Georgia law, a manufacturer of property is liable to a consumer of that property "who suffers injury to his person or property because the property when sold by the manufacturer was not merchantable and reasonably suited to the use intended, and its condition when sold is the proximate cause of the injury sustained." OCGA § 51-1-11 (b) (1). In order for liability to attach to a manufacturer, "the injury must be the proximate result of a defect in the product which existed at the time sold."

---

[3] The trial court granted summary judgment in favor of SMAI after all parties conceded that it was not subject to strict liability.

(Citation and punctuation omitted.) *Hall v. Scott USA, Ltd.*, 198 Ga. App. 197, 200 (2) (400 SE2d 700) (1990); see *Talley v. City Tank Corp.*, 158 Ga. App. 130, 134 (3) (279 SE2d 264) (1981). Of course, "[u]nless the manufacturer's defective product can be shown to be the proximate cause of the injuries, there can be no recovery." *Talley*, 158 Ga. App. at 135 (3).

Even if a manufacturer's design is proven to be defective and was so at the time of sale, however, the manufacturer's liability may be negated by an intervening cause, such as the unforeseeable negligence of another person. See *Hall*, 198 Ga. App. at 200.

> The general rule is that if, subsequently to an original wrongful act, a new cause has intervened, of itself sufficient to stand as the cause of the misfortune, the former must be considered as too remote[;] [but,] if the character of the intervening act claimed to break the connection between the original wrongful act and the subsequent injury was such that its probable or natural consequences could reasonably have been anticipated, apprehended, or foreseen by the original wrong-doer, the causal connection is not broken, and the original wrong-doer is responsible for all of the consequences resulting from the intervening act.

(Citation and punctuation omitted.) *Tensar Earth Technologies, Inc. v. City of Atlanta*, 267 Ga. App. 45, 49 (2) (598 SE2d 815) (2004). Thus, for any intervening

12

act to become the sole proximate cause of a plaintiff's injuries, the act "must not have been foreseeable by defendant, must not have been triggered by defendant's act, and must have been sufficient by itself to cause the injury." (Citation and punctuation omitted.) *Ontario Sewing Machine Co. v. Smith*, 275 Ga. 683, 686 (2) (572 SE2d 533) (2002).

SMC's argument fails on the foreseeability aspect of this analysis alone. It is undisputed that the defect in the brake cylinder – namely, the direct contact of the steel spring and the zinc piston – was present in Johns's motorcycle when it was sold. Further, there was evidence presented as to the industry's long-standing knowledge, and Suzuki's knowledge in particular, that the chemical reaction caused by that particular combination of metals in the presence of water, which is commonly found in brake fluid, produced corrosion debris. Although SMC also presented evidence that changing the brake fluid regularly may have reduced the possibility of the development of corrosion, it also admitted that the majority of its customers do not follow a regular maintenance schedule, including changing the brake fluid, and that the customers' failure to do so is a well known and established fact. Further, there was documentary evidence supporting a finding that Suzuki was unable to conclusively determine that the corrosion would not occur even if customer

maintenance was properly preformed. And finally, there was evidence that Johns's back brake – which had the same master cylinder design but included a rubber insulator – and also had the same lack of maintenance history, was not corroded.

Under these circumstances, the question of whether Johns's failure to replace the brake fluid was an intervening cause that broke the causal connection between SMC's defective design of the brake cylinder and Johns's injuries was squarely one for the jury. *Tensar Earth Technologies*, 267 Ga. App. at 50 (2) ("Questions regarding proximate cause are undeniably [for] jury [resolution] and may only be determined by the courts in plain and undisputed cases.") (citation and punctuation omitted). Further, there was sufficient evidence in the record to support the jury's rejection of SMC's position. *Chrysler Group, LLC v. Walden*, 339 Ga. App. 733, 735 (1) (792 SE2d 754) (2016) (recognizing that we will not substitute our judgment for that of the jury and will affirm if there is any evidence to support the verdict). It follows that the trial court did not err in denying SMC's motion for directed verdict on this claim.

(b) Suzuki asserts that the trial court erred in denying its directed verdict on Johns's claim for negligent failure to warn. Suzuki argues that (i) it had no notice of the defect that caused Johns's accident; (ii) there was no expert testimony that its

14

warnings were insufficient; and (iii) Johns ignored the warnings provided in the owner's manual.

Under Georgia law, a manufacturer has a duty to warn of "nonobvious foreseeable dangers from the normal use of its products." (Citation and punctuation omitted.) *Certainteed Corp. v. Fletcher*, 300 Ga. 327, 330 (2) (794 SE2d 641) (2016). "[T]he duty to warn arises whenever the manufacturer knows or reasonably should know of the danger arising from the use of its product[s]." (Citation and punctuation omitted.) Id.; *Chrysler Corp. v. Batten*, 264 Ga. 723, 724 (1) (450 SE2d 208) (1994). Thus, the duty to adequately warn the public of defects in a product is continuous, even after that product has left the control of the manufacturer to be sold or distributed to the consumer.[4] See *Hunter v. Werner Co.*, 258 Ga. App. 379, 383 (2) (574 SE2d 426) (2002) ("A negligent failure to warn claim may arise from a manufacturer's post-sale knowledge acquired months, years, or even decades after the date of the first sale of the product.") (citation and punctuation omitted); see also OCGA § 51-1-11 (c); *Batten*, 264 Ga. at 724 (1).

---

[4] In its reply brief, Suzuki briefly references in passing the "general rule" that the continuing duty to warn does not extend to "non-manufacturers like SMAI." As discussed in Division 1, the verdict form, by express consent of the parties, did not distinguish between the "Defendants" when asking the jury to determine the liability associated with any claim. Consequently, we will not do so now.

Thus, "[w]hether a duty to warn exists . . . depends upon foreseeability of the use in question, the type of danger involved, and the foreseeability of the user's knowledge of the danger." (Citation and punctuation omitted.) *Hunter*, 258 Ga. App. at 384 (2). It may be breached by "(1) failing to adequately communicate the warning to the ultimate user or (2) failing to provide an adequate warning of the product's potential risks." *Wilson Foods Corp. v. Turner*, 218 Ga. App. 74, 75 (1) (460 SE2d 532) (1995). Significantly, such issues should generally be resolved by the jury. See *Hunter*, 258 Ga. App. at 385 (2).

(i) Contrary to Suzuki's contention, the record does contain evidence creating a jury issue as to whether Suzuki had knowledge of a defective condition in the motorcycle's brake cylinder that would give rise to a duty to warn. There was evidence that as early as 2009, Suzuki began receiving complaints from customers related to an experienced decrease of pressure in the front brake. By November 2012, there had been 60 documented complaints about the front brake, ranging from a decrease in pressure to a total loss of pressure. And by December 2012, Suzuki recognized that the brake issue was "very dangerous." Suzuki also acknowledged internally that customers experiencing issues with their front brake may not recognize

16

the problem as a structural defect, but rather mistakenly believe it to be a maintenance issue.

In disclaiming its knowledge, Suzuki takes the extremely narrow view that it was unaware "that theoretical particles could generate" in the master cylinder that could disrupt the seal and create brake failure. While that may be true, there was nevertheless evidence to support a finding that Suzuki at least should have known that a defective design in the master cylinder resulted in corrosion of the brake piston and produced corrosive byproducts that might interfere with the functioning of the front brake, and that some customers had complained of a loss of brake pressure. Under these circumstances, the trial court did not err in declining to grant Suzuki judgment as a matter of law on the question of its knowledge. See generally *Ford Motor Co. v. Stubblefield*, 171 Ga. App. 331, 336 (2) (319 SE2d 470) (1984).

(ii) Suzuki argues that Johns failed to present expert testimony that the warnings provided in its owner's manual were inadequate or defective. The manual included a "maintenance chart" which listed "brake fluid" and indicated it should be "[r]eplace[d] every two years." On a separate page, the manual included a "WARNING" box that stated, "Improper maintenance or failure to perform

17

recommended maintenance increases the chance of an accident or motorcycle damage."

"[E]xpert opinion testimony on issues to be decided by the jury, even the ultimate issue, is admissible only where the conclusion of the expert is beyond the ken of the average layman." (Citation and punctuation omitted.) *Whitlock v. Moore*, 312 Ga. App. 777, 780 (1) (720 SE2d 194) (2011). There is nothing to suggest that a determination of the adequacy of the warnings in Suzuki's instruction manual presented an issue beyond the ken of an average juror. See *Key Safety Systems*, 334 Ga. App. at 720 (1) ("Questions of adequacy of a warning and proximate cause resulting from a complete lack of warning or an inadequate warning are peculiarly questions for the jury.") (citation and punctuation omitted). Thus, no expert testimony on this issue was required, or would have even been proper. See id.

(iii) Suzuki contends that Johns's admitted failure to adhere to the maintenance schedule in the owner's manual of his motorcycle with respect to the replacement of the brake fluid barred his claim. Suzuki ignores, however, that evidence was presented suggesting that even had Johns been diligent in changing his brake fluid according to the maintenance schedule, corrosion may not have been prevented due to the design of the cylinder. The record also contains evidence that John's rear brake

18

cylinder, which included the same design with the exception of the rubber insulator, had also never been changed, and yet was not corroded. This evidence was sufficient to create a jury issue. See generally *Giordano v. Ford Motor Co.*, 165 Ga. App. 644, 645 (2) (299 SE2d 897) (1983).

(c) Suzuki also asserts that it was entitled to directed verdict on Johns's negligent recall claim. We need not address this enumeration of error, however, because it has been rendered moot by our affirmance of the jury's verdict on the previous two claims.

3. Finally, Suzuki contends that it is entitled to a new trial because the trial court erred by admitting, over its objection, evidence of (i) Suzuki's voluntary recall of its front brake master cylinder, and (ii) two similar incidents. We will address each in turn.

(i) Suzuki argues that evidence of its voluntary recall in October 2013 should have been excluded as irrelevant and overly prejudicial.

In product liability cases, evidence of a recall is admissible so long as the subject of the litigation involves the same or substantially similar product as the product being recalled, and there is independent evidence that the product which is the subject of the litigation suffers from the same alleged defect as that giving rise to

the product recall. See *Harley-Davidson Motor Co., Inc. v. Daniel*, 244 Ga. 284, 286 (2) (260 SE2d 20) (1979); *Rose v. Figgie Intern.*, 229 Ga. App. 848, 854-55 (2) (495 SE2d 77) (1997) (physical precedent only).

It is undisputed that the front master cylinder on Johns's bike was subject to the recall, so this issue turns on whether the defect in Johns's motorcycle was the same defect that gave rise to the recall. See *Harley-Davidson Motor Co.*, 244 Ga. at 286 (2). In contending that it does not, Suzuki again takes a very narrow view of the purpose of the recall, insisting that it was meant to address a buildup of hydrogen gas – not zinc formate, and resulted in "spongy" brakes – not a total brake failure. First, we note that Johns experienced the "spongy" brake problem – the same problem described in the recall – prior to his brake's total failure. But nevertheless, both defects involved corrosion byproduct created as a result of a defectively designed master cylinder that then interfered with the functioning of the front brake. Consequently, the trial court did not abuse its broad discretion in admitting the recall evidence. See generally *Chrysler Group*, 339 Ga. App. at 747 (7). Likewise, the trial court had broad discretion in determining whether the evidence was overly prejudicial pursuant to OCGA § 24-4-403, and did not err in allowing it. See generally *State v. Orr*, __ Ga. __ (4) (b) (Case No. S18G0994) ("[E]xclusion of evidence under Rule

20

403 is an extraordinary remedy that should be used only sparingly to prohibit matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect.") (citation and punctuation omitted); *Harley-Davidson Motor Co.*, 244 Ga. 284, 286 (260 SE2d 20) (1979).

(ii) Suzuki contends that the trial court erred by allowing evidence of two unrelated motorcycle accidents involving front brake failure as evidence of Suzuki's knowledge of the defect, asserting that the evidence should have been excluded as irrelevant.

"In product liability actions, evidence of other incidents involving the product is admissible, and relevant to the issues of notice of a defect, provided there is a showing of substantial similarity." (Citations and punctuation omitted.) *Ford Motor Co. v. Reese*, 300 Ga. App. 82, 89 (3) (684 SE2d 279) (2009); see *Cooper Tire & Rubber Co. v. Crosby*, 273 Ga. 454, 455 (1) (543 SE2d 21) (2001). "In order to show substantial similarity, the plaintiff must come forward with evidence (1) that the products involved in the other incidents and the present incident shared a common design and manufacturing process; (2) that the products suffered from a common defect; and (3) that any common defects shared the same causation." (Citation and punctuation omitted.) *Reese*, 300 Ga. App. at 89-90 (3); see *Crosby*, 273 Ga. att 456

21

(1). We will defer to the trial court's exercise of its discretion with respect to the admission of similar evidence and will not reverse absent clear abuse. See *Reese*, 300 Ga. App. at 89 (3); see *Crosby*, 273 Ga. att 456 (1).

Here, the trial court admitted evidence from two Suzuki GSX-R motorcycle owners who also experienced a complete front brake failure while riding their motorcycles. There is no dispute that the master cylinder on their motorcycles shared a common design. The first witness described the failure "like flicking a light switch"; he was able to "pull the brake lever all the way back" and experienced no resistance. After listing to the witness's proffered testimony, the trial court noted that it was "exactly like what [Johns] experienced." The witness replaced the bike's master brake front cylinder after the accident and had no further problems with the brake.

The second witness also described a total brake failure, stating that "there was nothing happening" when he squeezed the front brake, and that he "pulled all the way back . .. with no compression behind it." When he took the bike in to get repaired after the accident, the front brake master cylinder was replaced.

The trial court relied on the similarities in between the witnesses' accounts and Johns's accident to conclude that the motorcycles shared a common defect and that

those defects shared a common causation. The trial court did not abuse its discretion by admitting evidence of the similar incidents, particularly in light of Suzuki's repeated denials that the design defect at issue in the recall could result in a total loss of front brake pressure. See *Chrysler Group, LLC v. Walden*, 339 Ga. App. 733, 739-740 (2) (792 SE2d 754) (2016); *Reese*, 300 Ga. App. at 89 (3); *Skil Corp. v. Lugsdin*, 168 Ga.App. 754, 754-755 (1) (309 SE2d 921) (1983).

*Case No. A19A0109*

Johns argues on cross-appeal that the trial court erred by reducing the jury's award in accordance with the jury's assessment of fault pursuant to OCGA § 51-12-33 (a), which he contends has no applicability to an award based on a strict liability claim. He argues that this error was compounded by reducing his wife's award for loss of consortium.

Johns's argument is premised upon the common law principle that a plaintiff's comparative negligence is not a defense to a product liability claim based upon strict liability. See generally *Deere & Co. v. Brooks*, 250 Ga. 517, 518 (1) (299 SE2d 704) (1983). The question at issue is how that common law principle is impacted by Georgia's apportionment statute, OCGA § 51-12-33 (a), which provides as follows:

23

Where an action is brought against one or more persons for injury to person or property and the plaintiff is to some degree responsible for the injury or damages claimed, the trier of fact, in its determination of the total amount of damages to be awarded, if any, shall determine the percentage of fault of the plaintiff and the judge shall reduce the amount of damages otherwise awarded to the plaintiff in proportion to his or her percentage of fault.

We begin by noting that by its plain terms, the statute governs actions "for injury to person," without in any way distinguishing between the theories upon which those claims are premised. See *Deal v. Coleman*, 294 Ga. 170, 172-73 (1) (a) (751 SE2d 337) (2013) ("When we consider the meaning of a statute, we must presume that the General Assembly meant what it said and said what it meant.") (citation and punctuation omitted.). The statute then directs a trial court reduce the amount of damages awarded to the plaintiff by the jury in proportion to his or her percentage of "fault," but notably does not refer to the plaintiff's "negligence." OCGA § 51-12-33 (a); see *Couch v. Red Roof Inns*, 291 Ga. 359, 362 (1) (729 SE2d 378) (2012) (holding that "fault" as used in the statute "is not meant to be synonymous with negligence, but instead includes other types of wrongdoing").

Further, although it is not immediately clear from the text of the statute its impact on the common law principles as they relate to claims premised on strict

24

liability, our analysis of that issue is largely guided by the Supreme Court's opinion in *Couch*, 291 Ga. 359. The *Couch* Court examined whether OCGA § 51-12-33 (a) allowed a jury to consider the "fault" of a criminal assailant and include the assailant when apportioning its damage award to the plaintiff. Id. at 359 (1). The Court held that it did, despite its recognition of the long-standing common law rule against apportionment to intentional tortfeasors. Id. at 366 (1).

In so doing, the *Couch* Court stated, in no uncertain terms, that OCGA § 51-12-33 was intended by the General Assembly "to displace the common law of apportionment." Id. at 364 (1); see also *Zaldivar v. Prickett*, 297 Ga. 589, 594 (1) (774 SE2d 688) (2015). The Court further noted that the legislature had excluded certain torts from the statutory provision immediately proceeding OCGA § 51-12-33, and held that if had it intended to exclude any acts from the apportionment statute, it would have done so. *Couch*, 291 Ga. at 362-363 (1) ("[W]hat a legislature normally does, if it wants to make sure that readers understand that a word with a broad ordinary meaning does not include something within that meaning, is to expressly define that thing out of the category.").

Reading the plain language of the statute in conjunction with the Supreme Court's holding in *Couch*, we conclude that the trial court did not err in apportioning

Johns's damage award on his claim for strict product liability. Further, because Gwen Johns's loss of consortium claim was derivative of and arises out of the tort committed against Johns, her award must also be reduced. See *Zaldivar*, 297 Ga. at 589, n.1; *Barnett v. Farmer*, 308 Ga. App. 358, 362 (2) (707 SE2d 570) (2011) (physical precedent only).[5]

*Judgment affirmed in Case No. A19A0108; Judgment affirmed in Case No. A19A0109. Miller, P. J., and Reese, J., concur.*

---

[5] This holding renders moot Johns's assertion that the trial court erred in failing to award prejudgment interest pursuant to OCGA § 51-12-14 (a), because the jury's verdict does not exceed Johns's pretrial demand.