## A03A1312. SHIELDS v. THE STATE.
(590 SE2d 217)

ADAMS, Judge.

Randy Shields was indicted by a grand jury, along with William Perry, on charges of rape, aggravated sodomy, aggravated assault with intent to rape, and false imprisonment. The trials of the two defendants were severed, and a jury found Shields guilty of all charges. Shields appeals.

Viewed in the light most favorable to the verdict, the evidence showed that on the morning of June 18, 2000, the victim was beaten and raped by three men in a duplex apartment near downtown Athens. The night before, the victim's car broke down at an apartment she had been visiting, and she got a ride to another apartment complex to find a phone. The victim came into contact with Shields there. She said that another man at the apartment complex tried to "sell" her for some crack. The victim refused to cooperate and walked away to find a phone. Later, however, someone gave the victim some crack cocaine, and she began to perform oral sex on him behind a house. But the victim said that she stopped, began crying, and walked away because she realized it was wrong. During this time, Shields and another man were with her and they stayed with her during the night.[1]

The victim testified that the three continued to walk in neighborhoods near downtown Athens throughout the early morning hours. They were looking for crack as well as a phone for the victim to call her family. At around 7:00 a.m., they met up with Perry, Shields's codefendant, and went to his duplex so that she could use the phone. One side was occupied by his mother and stepfather, and the other side was vacant. The victim and the men entered the vacant apartment, and the men left to see if they could get more crack. The victim stayed behind, waiting for a ride home or to a phone. The men returned with a car and a very small piece of crack that they all smoked.

Perry began telling the victim that she was not leaving, but

---

[1] The man who gave the victim crack in exchange for sex told police a few days after the incident that he saw Shields that night with the victim and another man. The witness told the police that before Shields walked off with the victim, he told the witness that "if she don't act right, I'm going to take that pussy." A tape of the witness telling police about this statement was played for the jury. But the witness recanted this statement on the stand.

rather was going to stay and have sex with him. She told Perry, "no." He replied that she was having sex whether she wanted to or not, or he would kill her. Shields and the other man then began holding her while Perry beat her. They told her to stop crying because the sex was going to happen anyway. Perry slammed her head into a wall, rendering her unconscious for a short period. When she woke up, the three were talking about her, and she felt as if they were "all working together" against her.

Someone jerked her up by her hair and Perry forced her into the bathroom, where afterward the men took turns raping her. Perry forced her to perform oral sex and then vaginally raped her despite the fact she told him, "no." During this time, Shields and the other man were outside, blocking the doorway, telling her to stop crying and saying that they were next. The other man[2] came in next and raped her while she protested. Shields then came into the bathroom and raped her although she begged him to let her go. In between assaults, the victim wiped herself off with a pink t-shirt at the men's direction to clean herself up.

After Shields left the bathroom, Perry returned and assaulted her again. Later, she was able to burn him with her cigarette and escape the bathroom, but the men chased after her and kept her from leaving. Eventually, the victim managed to escape while the men were discussing what to do with her. The men walked out of the apartment, but she was able to get to a pay phone where she called her friend, Angie Williams, who came to pick her up.

The victim told Williams that she had been beaten and raped in a bathroom by three men, who took turns. She did not want to tell the police because she was afraid of the men and afraid that she would get into trouble for smoking crack. Williams drove the victim home. She said that the victim was upset and crying, her hair was knotted up, her face was swollen and red, and she had bleeding cuts behind her ear.

When she reached home, the victim told her sister what had happened and called 911 to request an ambulance, telling the operator that she had been raped. In response, police were dispatched to her house, where they took an initial report. The officers noticed that she was very distraught with dried blood running from her ear, red marks behind her ears, a swollen face, and red marks on her arms and face.

Police drove the victim to the scene of the attack, where she became visibly upset and frightened and slumped down in her seat. Police later collected evidence from the scene that supported the vic-

---

[2] The third man was never identified at trial.

tim's story. The officers also interviewed Perry's stepfather in the duplex apartment next door. He told officers that he had heard screaming early that morning and a man yell, "Shut up, bitch." He also said that he heard a lot of knocking around and thought that possibly construction was going on next door. The duplex owner testified, however, that no one had permission to be in the vacant apartment and that there was no construction at that time.

The victim was taken to the police station where she gave a statement describing the incident. She described the men as one who was slim and muscular, one who was big, and one who had a chipped tooth. The slim one and the man with the chipped tooth were both wearing Krystal employee shirts. That statement was introduced at trial as a prior consistent statement.

She was also taken for treatment of her injuries and testing. The nurse examiner testified that she observed bruising on the victim's face, neck, and throat. She also had a cut behind her ear, with blood running into her hair. Although the nurse found no vaginal bruising, she testified that this was not unusual in adult rape victims. One sperm sample taken from the pink t-shirt at the crime scene contained a partial match to Shields's DNA, but the expert could not state conclusively that it matched Shields's DNA.

Police later went to Krystal to determine which of their employees had worked the night before. The manager identified Perry and Shields as employees of the restaurant. The assistant manager said that Shields had shown up dressed for work the night before, but had not been on the schedule. The victim later picked Perry and Shields out of a lineup.

After the jury found Shields guilty, the trial court excused them, over Shields's objection, and proceeded with the sentencing hearing. Shields was sentenced to life without parole on the rape and aggravated sodomy charges and ten years on the false imprisonment charge. The trial judge ruled, however, that the aggravated assault with intent to rape merged with the rape charge for purposes of sentencing.

1. Shields first contends that the trial court erred in denying his motion for mistrial on the ground that the state had not provided his attorney with a current address and phone number for the victim. Defense counsel did not move for a continuance, but simply sought a mistrial.

Shields opted into reciprocal discovery under Georgia's Criminal Procedure Discovery Act, OCGA § 17-16-1 et seq. The prosecuting attorney is required under that act to furnish the defense with names, current locations, dates of birth, and telephone numbers of the state's witnesses. OCGA § 17-16-8 (a). And our Supreme Court has held that the parties to reciprocal discovery have the affirmative

duty to attempt to acquire the information required by the statute. They "may not rest solely on the fact that it is not within their possession." *State v. Dickerson*, 273 Ga. 408, 410 (1) (542 SE2d 487) (2001).

The record here reflects that the prosecution furnished the defense with the victim's address in Athens and a later address and phone number in Blairsville. On cross-examination, however, the victim testified that she had never lived at the Blairsville address and said that she had notified the state of her current address in Carrollton approximately one year before trial. Ashley Ivey, director of victim assistance for the district attorney's office, testified that she always reached the victim through the Blairsville number, which belonged to the victim's father and stepmother. Ivey admitted that she knew the victim had moved to Carrollton some six to eight months earlier, but said that she never asked for nor received a Carrollton address or phone number because she was always able to contact the victim through the Blairsville number.

The record further showed that the first time defendant's attorney told the district attorney that he was having a problem reaching the victim was the morning of jury selection. The state offered to make the victim available that evening for an interview, but the victim would only agree to the interview if Ivey were present. The defense declined to interview the victim under those circumstances.

Under the authority of *Dickerson*, the prosecutor should have made an effort to obtain the victim's Carrollton address and phone number, once informed of her move. But it does not follow that the trial court was required to grant Shields's motion for mistrial. When the state fails to comply with the discovery statute,

> the court may order the state to permit the discovery or inspection, interview of the witness, grant a continuance, or, upon a showing of prejudice and bad faith, prohibit the state from introducing the evidence not disclosed or presenting the witness not disclosed, or may enter such other order as it deems just under the circumstances.

OCGA § 17-16-6. Thus, "[i]n enacting OCGA § 17-16-6, the legislature did not impose a rigid formulation or grant an exclusive remedy for a defendant or a fatal consequence to the State for failure to comply with the discovery mandates. Instead, it cloaked the trial court with the discretion to use its own judgment to ensure a fair trial." (Punctuation and footnote omitted.) *Gay v. State*, 258 Ga. App. 634, 639 (3) (574 SE2d 861) (2002).

Here, the state furnished the defense with the contact information that the prosecution successfully used and further offered to

make the witness available for an interview. The victim herself imposed the condition that Ivey be present during the interview. Under these circumstances, we find that it was not an abuse of discretion to conclude that the state had not acted in bad faith.[3]

Moreover, it is undisputed that Shields was aware of the victim's identity and the state's intention to call her as a witness at trial. "The witness list rule is designed to prevent a defendant from being surprised at trial by a witness that the defendant has not had an opportunity to interview." (Citation and punctuation omitted.) *Rose v. State*, 275 Ga. 214, 217 (3) (563 SE2d 865) (2002). Shields's attorney turned down the opportunity to interview the victim because he did not like the conditions she imposed. And it is possible that even if defense counsel had received updated contact information, the victim may have imposed similar conditions or may have simply chosen not to speak with him. Accordingly, we find that Shields failed to establish prejudice arising from the state's incomplete address for the victim. See id.

Further, Shields never requested a continuance to cure any prejudice which he claims may have arisen as a result of the state's failure to comply with OCGA § 17-16-8 (a). "Consequently, the trial court did not have authority, under OCGA § 17-16-6, to exercise discretion and exclude [the victim's testimony] at trial. It thus follows that the trial court did not err in denying defendant's motion for a mistrial." *Bell v. State*, 224 Ga. App. 191, 192 (480 SE2d 241) (1997).

2. Shields further contends that the trial court erred in admitting the entire videotaped statement provided by the victim to police at the time of the incident. He asserts that the statement did not fall under any recognized exception to the hearsay rule and only served to improperly bolster the victim's testimony.

The Supreme Court of Georgia has held that "a witness's prior consistent statement is admissible . . . 'only where (1) the veracity of a witness's trial testimony has been placed in issue at trial; (2) the witness is present at trial; and (3) the witness is available for cross-examination.' " (Citations omitted.) *Baugh v. State*, 276 Ga. 736, 738 (2) (585 SE2d 616) (2003), citing *Woodard v. State*, 269 Ga. 317, 320 (2) (496 SE2d 896) (1998). "[A] witness's veracity is placed in issue so

---

[3] Nor are we persuaded by Shields's argument that prosecuting counsel's argument on this point demonstrates bad faith. The prosecutor expressed her belief that a rape victim's address should be afforded confidentiality from the defendant, especially where there have been threats upon her life. It appears, however, that the prosecutor made that argument in response to and out of concern for defense counsel's soliciting the victim's current address in open court. And any negative inferences arising from that statement are offset by the fact that the prosecution furnished the victim's Athens address to the defense at the time of the crime.

as to permit the introduction of a prior consistent statement only if affirmative charges of recent fabrication, improper influence, or improper motive are raised during cross-examination." (Citations and punctuation omitted.) Id.

Here, the victim was present at trial and was subjected to a thorough cross-examination by the defense, including questioning about inconsistencies between her pretrial statements and her trial testimony. For example, the defense attorney asked the victim if she recalled telling police that Shields did not hold her in the apartment, although her testimony at trial was that Shields did restrain her. He also questioned whether she told police that all three had beaten her. On the stand, she said that only Perry had beaten her while the other two held her. Thus, we find that the cross-examination placed the victim's veracity at issue, by implying that she had changed her story for trial. See *Alvarado v. State*, 257 Ga. App. 746, 748-749 (3) (572 SE2d 18) (2002). Moreover, both the cross-examination and the opening statement by the defense implied that the victim's allegations were improperly motivated by anger over Perry hitting her after she unsuccessfully tried to steal money from him or were simply the result of her drug use. Under these circumstances, we find no error in the admission of the victim's videotaped statement to police.

3. Shields also argues that the trial court erred in admitting his pretrial statement because it was not given under oath, and he asserts that it was not an admission or confession. Shields notes that in the portion of the statement that was played for the jury, he told police that he had not been to Perry's duplex the morning in question and had not had sex with any white girl. Thus, he asserts that his statement was inadmissible hearsay. The state argues, however, that even though Shields denied being present at the time of the crime, he does admit that he knew and associated with Perry.

Even assuming, without deciding, that the statement was inadmissible hearsay, we find no ground for reversal. In cases of such nonconstitutional error, reversal is not required if there is "no reasonable probability that the verdict of the jury would have been different in the absence of [the] error." (Citations and punctuation omitted.) *Lowther v. State*, 263 Ga. App. 282, 283 (1) (587 SE2d 335) (2003). Considering that Shields's statement contains a denial of his presence and involvement in the crime and that the evidence of his guilt was overwhelming, we find that the admission of his statement constituted harmless error. Cf. *Hightower v. State*, 272 Ga. 42, 44 (2) (526 SE2d 836) (2000) (involving alleged constitutional violation). See also *Evans v. State*, 259 Ga. App. 9, 12-13 (4) (576 SE2d 27) (2002) ("In order to have reversible error, there must be harm as well as error.").

4. Shields further asserts that his trial attorney was ineffective in failing to present evidence or testimony to explain the presence of his DNA at the crime scene.

> In order to establish a claim of ineffective assistance of counsel, the appellant must show both that counsel's performance was deficient and that a reasonable probability exists that but for counsel's deficient performance, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U. S. 668, 695-696 (104 SC 2052, 80 LE2d 674) (1984). [Cit.]

*Brogdon v. State*, 262 Ga. App. 673, 675 (2) (586 SE2d 344) (2003).

In particular, Shields states that his attorney should have called a witness he had under subpoena, who would testify that she had sex with Shields at the vacant duplex apartment earlier and that she was wearing the pink t-shirt at the time. But Shields's trial attorney testified at the hearing on the motion for new trial that he made the decision not to call this witness because he did not think the jury would believe her because she was a "crack addict" and he feared that she would not hold up under cross-examination. Further, he did not want to lose the right to present the final argument to the jury.

Trial counsel's decision not to call the witness was clearly strategic. "There is a strong presumption that trial counsel provided effective representation, and we will not use hindsight to judge counsel's reasonable trial strategy and tactics." (Punctuation and footnote omitted.) *Coker v. State*, 262 Ga. App. 320, 322 (2) (585 SE2d 221) (2003). We are not required to find that trial counsel was deficient just because Shields and his present attorney now disagree with that decision. *Benham v. State*, 260 Ga. App. 243, 248-249 (5) (a) (581 SE2d 586) (2003).

5. In addition, Shields contends that the trial court erred in dismissing the jury over his objection during the sentencing phase of trial. He asserts that he had a right under OCGA § 17-10-2 to be sentenced by a jury because he was facing a sentence of life without parole.

But the state sought recidivist punishment under OCGA § 17-10-7. That statute provides that a defendant who is convicted of a second serious felony "shall be sentenced to undergo the longest period of time prescribed for the punishment of the subsequent offense of which he or she stands convicted. . . ." OCGA § 17-10-7 (a). Here, the state presented evidence of Shields's prior conviction on two counts of armed robbery. Thus, the sentence in this case was mandatory; although the trial judge is given discretion to probate or suspend a sentence, where permissible. Id.; OCGA § 17-10-1.

Under these circumstances, the trial judge could determine the sentence without a jury. "As the prior convictions were the basis for the increased sentences, the court could properly determine such without a jury. Here the certified conviction[ ] provided ample support for the court's enhancement of the sentences." *Schwindler v. State*, 254 Ga. App. 579, 589 (11) (563 SE2d 154) (2002). See also *Zachery v. State*, 241 Ga. App. 722, 723 (2) (527 SE2d 601) (2000) ("[A] defendant has no right to a jury trial on a recidivism count."). Cf. *Apprendi v. New Jersey*, 530 U. S. 466, 490 (120 SC 2348, 147 LE2d 435) (2000).

6. Shields also argues that the trial court erred in admitting evidence of his prior conviction because the certified copy of the conviction attached to the state's notice of intent to seek recidivist punishment was illegible. The trial court agreed that the copy was illegible, but allowed the state to amend its notice to attach a more legible, certified copy. Shields asserts, however, that the indictment number on the amended conviction differed from the indictment number on the original copy. The original certified microfiched record served on defendant showed an indictment number of "SU89CR17325" on the sentence review order and the state's notice reflected the number "SU-89-CR-173238" and indicated that it was a conviction for armed robbery and kidnapping with bodily injury. The amended certified copy, pulled from the file itself, included the indictment which reflected the numbers "SU-89-CR-1732-5-G" and "SU-89-CR-1739-42-G." And the indictment listed charges of two counts of armed robbery and kidnapping with bodily injury. Having reviewed the record, we find no error in the trial court's conclusion that Shields had sufficient notice of the prior conviction. *Davis v. State*, 246 Ga. App. 877, 879 (3) (542 SE2d 626) (2000).

Furthermore, Shields's attorney did not move for a continuance on the basis of the inadequacy of the notice. "[W]e have held that counsel's failure to move for a continuance precludes a defendant from arguing that his counsel did not have an ample opportunity to investigate the admissibility of the prior conviction. *Day v. State*, 188 Ga. App. 648, 650-651 (8) (374 SE2d 87) (1988)." (Citation omitted.) *Davis*, supra.

*Judgment affirmed. Andrews, P. J., and Barnes, J., concur.*

DECIDED NOVEMBER 19, 2003.

*Vicki E. Carter*, for appellant.

*Kenneth W. Mauldin*, District Attorney, *Anna E. Watkins*, Assistant District Attorney, for appellee.