A05A1152. FORD MOTOR COMPANY v. SASSER.
(618 SE2d 47)

BLACKBURN, Presiding Judge.

In this products liability action, Ford Motor Company appeals a $47.7 million jury verdict entered in favor of Kelsey Sasser, who was permanently paralyzed when the back seat latch of a Ford vehicle failed during an auto accident, thereby causing the back seat to collapse forward and injure six-year-old Kelsey's spinal cord. Ford contends that the trial court erred by: (1) denying its motion for new trial because plaintiff's theory of the case lacked credibility; (2) failing to enforce an in limine ruling prohibiting references to one of Ford's pretrial experts and his theory of the case; (3) excluding from evidence the results of a certain scientific test performed after the trial was underway; (4) admitting prior consistent statements of two witnesses whose veracity had not been questioned previously; (5) denying Ford's motion for j.n.o.v. on the issue of punitive damages; and (6) allowing post-judgment interest on the award. For the reasons set forth below, we affirm.

Following a jury verdict, we must construe the evidence and all possible inferences in favor of the verdict. See *Tensar Earth Technologies v. City of Atlanta*.[1] "It is not our function to weigh the evidence or judge the witnesses' credibility. It is the function of the trier of fact to resolve any conflicts in the testimony of witnesses. We cannot substitute this court's judgment for that of the trier of fact." (Citation omitted.) *Bowen Builders Group v. Reed*.[2]

Viewed in the light most favorable to the verdict, the record shows that three eyewitnesses (Kelsey, her mother, and her sister) testified that in June 2000, Kelsey's mother strapped six-year-old Kelsey into a seat belt in the middle of the back seat of a Ford Lincoln LS vehicle (model year 2000). Kelsey's eight-year-old sister was strapped in the front passenger seat. While driving, Kelsey's mother overcorrected her steering and accidentally swerved the car into oncoming traffic, striking a pickup truck head-on.

In the impact of the ensuing collision, the back seat latch in the vehicle failed and the back seat folded forward, striking Kelsey and

---

[1] *Tensar Earth Technologies v. City of Atlanta*, 267 Ga. App. 45, 53 (5) (598 SE2d 815) (2004).

[2] *Bowen Builders Group v. Reed*, 252 Ga. App. 54, 56 (555 SE2d 745) (2001).

forcing Kelsey forward against her shoulder seat belt in such a way as to injure her spinal cord.[3]

Following the accident, with the assistance of one passer-by, Kelsey's sister unlatched herself in the front seat and exited the vehicle out the front passenger door. Kelsey's sister then witnessed Kelsey crawl to the front seat so as to be next to her mother. Emergency personnel found Kelsey in the front seat when they arrived, and her seat belt, which all parties conceded had been latched during the accident, was unlatched, indicating that she had moved after the accident.

When emergency personnel began treating Kelsey, she was combative and moved all her limbs, which were still functional when she arrived at the hospital. Later, Kelsey became permanently paralyzed as a result of the collision.

In April 2003, Kelsey's mother, as her representative, renewed a products liability action against Ford, alleging that the back seat latch was defectively designed. Following a lengthy trial, a jury awarded Kelsey $33,868,000 in compensatory damages and $13,959,311 in punitive damages. The trial court denied Ford's motions for j.n.o.v. and for new trial, and this appeal followed.

1. Ford contends that the trial court abused its discretion in denying Ford's motion for new trial, arguing that the evidence and testimony showing that Kelsey crawled from the back seat to the front seat after the collision lacked credibility.

"The trial court's denial of a motion for new trial on evidentiary grounds will be reversed on appeal only if there is *no* evidence to support the verdict." (Punctuation omitted.) *Mansfield v. Pizza Hut of America.*[4] We do not weigh the evidence or judge the witnesses' credibility. *Bowen Builders Group*, supra. Furthermore, it must be remembered that "[t]he testimony of a single witness is generally sufficient to establish a fact."[5]

Construed in favor of the verdict, the following evidence supported plaintiff's theory that Kelsey was in the back seat and crawled to the front seat in the aftermath of the accident.

(a) Kelsey, her mother, and her sister unequivocally testified that Kelsey was strapped into the back seat at the time of the accident.

(b) The family had a system in place in which the sisters alternated who would have the privilege of sitting in the front seat.

---

[3] The back seat latch system of the LS vehicle had caused Ford numerous problems over the years, both in the years leading up to the launch of the vehicle and in the years after the vehicle was on the market; the system often would simply not latch, despite strenuous efforts to force the latch to connect.

[4] *Mansfield v. Pizza Hut of America*, 202 Ga. App. 601, 602 (415 SE2d 51) (1992).

[5] OCGA § 24-4-8.

Kelsey's mother, Kelsey's sister, and the children's babysitter all testified that this was Kelsey's sister's week to sit in front.

(c) Kelsey's sister testified that, with the assistance of a bystander, she exited the front passenger door. Bystanders and an emergency responder said that the only door that was open was the front passenger door. Since Kelsey's sister was the only one to have exited the car at this point, this would indicate that she exited the front seat.

(d) Two experts testified that the only way Kelsey could have sustained the injuries she suffered was by being struck by the collapsing back seat during the accident.

(e) Kelsey's sister unequivocally testified that Kelsey crawled to the front seat after the sister exited the car. She stated: "I got out [of the car], and then . . . I looked in the back window, and I saw my sister crawling over the console and getting in the front seat." Kelsey's sister further testified that, once Kelsey had crawled into the front seat, "it looked like she was laying across the console like sitting in the front seat, and then my mom put her hand around my sister."

(f) Ford's experts agreed that the front seat belt had been latched around its occupant during the accident. When emergency personnel found Kelsey in the front seat, that seat belt was unlatched (an unlikely circumstance if Kelsey had been comatose and unmoving since the impact). Her head was toward her mother, suggesting she had crawled to the front seat to be near her mother.

(g) Emergency personnel further testified that when pulling Kelsey out of the front seat, they noted she had use of all her limbs, and, in fact, she became combative. One emergency technician testified that Kelsey was moving all her limbs in the ambulance on the way to the hospital.

The emergency room physician at the first hospital testified that he conducted a thorough examination and that he made no note in the medical records of Kelsey's having difficulty with moving her limbs, which he would have done if she had had such difficulties. The surgeon at the second hospital where she was immediately transferred recalled that he checked her limbs to be sure they moved and to be sure that she had sensation in them. He testified: "They seemed to have normal sensation, and she could move her hands and her feet up and down."

To contest all of the plaintiff's evidence listed directly above, Ford presented countervailing evidence, contending that Kelsey was riding in the front seat at the time of the accident and could not have maneuvered herself to the front seat from the back seat in her paralyzed condition.

First, Ford provided testimony from surgeons, including Kelsey's neurosurgeon, that it would have been difficult or unlikely, though

not beyond the realm of possibility, that Kelsey would have been able to pull herself into the front seat of the car after she was injured.[6] Second, Ford presented two bystander witnesses who testified that Kelsey's sister exited out the back seat door, not the front seat door. Third, Ford presented some evidence that both Kelsey's mother and her sister told others soon after the accident that Kelsey's sister, not Kelsey, was in the back seat. Both Kelsey's mother and her sister later recanted these statements, however, stating affirmatively that Kelsey was in the back seat. Fourth, it was undisputed that emergency personnel found Kelsey in the front seat. And fifth, Ford presented evidence from the dealership that leased the vehicle to Kelsey's mother that the back seat was latched when she received the car and that since no one had unlatched the back seat prior to the accident, it must have been latched at the time of the accident.

This contradictory evidence presented a classic question for the jury to resolve. See *Owens v. Ga. Power Co.*[7] Ford's position that its evidence "is inherently reasonable" while the evidence of plaintiff "is internally inconsistent, incomplete, and inherently unbelievable" was properly argued to the jury, which rejected it, but it has no place on appeal. Inasmuch as there was evidence to support the plaintiff's theory, we cannot say that the trial court abused its discretion in denying Ford's motion for new trial on evidentiary grounds.

2. Ford argues that the trial court erroneously failed to enforce an in limine ruling prohibiting references to Ford's prior expert or to that expert's theory of the case. We disagree.

Prior to trial Ford retained Dr. Roberts, who opined in his deposition that Kelsey's paralysis injuries were caused by the stretching or flexation of her spine when her body, sitting in the front passenger seat, thrust forward, improperly restrained only by the lap belt and not also by the shoulder belt (which was behind her). To reach this conclusion, Dr. Roberts relied on various "sled" tests performed by Ford, including Test 903. Test 903, performed by two other Ford experts, measured the impact of a collision on a dummy positioned in the front passenger seat sitting upright against the seat back and with the seat positioned nearly all the way back on its rack.

Two months before trial, Dr. Roberts began aggressive treatment for cancer that incapacitated him from testifying for at least six months. As the case had already been specially set for trial at Ford's request, the court denied Ford's motion for continuance due to Dr. Roberts's illness, and Ford retained a new expert, Dr. Raddin. After

---

[6] When asked whether he believed that Kelsey could have crawled into the front seat of the car, Kelsey's doctor testified: "I assume she could. We see people who do unusual things associated with trauma in certain proximity to an injury."

[7] *Owens v. Ga. Power Co.*, 229 Ga. 281, 282 (190 SE2d 897) (1972).

reviewing Ford's sled tests, including Test 903, Dr. Raddin performed a new test by moving the seat location forward and moving the dummy five inches forward in the seat from its original position in Test 903. Based on this modified test, Dr. Raddin concluded that, at the time of the accident, Kelsey was sitting buckled only with a lap belt in the front seat, but positioned as leaning far forward with her head between her knees, not sitting upright as tested in the original Test 903. He opined that the deploying front seat air bag struck her on the back, causing her spinal injuries. This result varied markedly from the demonstration shown in the original Test 903.

After learning the result of Dr. Raddin's test, Ford moved in limine to exclude at trial any references relating to Dr. Roberts, including references to the following:

(a) Dr. Roberts, his retention by Ford, his deposition, or any opinions stated or held by him;

(b) Ford's having hired any expert prior to Dr. Raddin;

(c) The date on which Dr. Raddin was retained as an expert witness;

(d) Any suggestion that Ford sought a new expert after becoming dissatisfied with Dr. Roberts;

(e) Any criticism of Dr. Raddin's inspecting the vehicle at a late date; and

(f) Any differences of opinion between Dr. Roberts and Dr. Raddin. The court granted the motion.

Ford claims that plaintiff's counsel violated this order and that the trial court erroneously failed to enforce the order or to grant a new trial as a remedy. The four specified violations of the order are discussed below.

(i) *Referring to Test 903 as Ford's Theory of the Case.* Ford first complains that during the cross-examination of one of the experts who conducted Test 903, plaintiff's counsel repeatedly referred to Test 903 as Ford's theory of the case. To understand this complaint, we must review the context.

As freely conceded in Ford's appellate reply brief, two of its experts (Messrs. Paddock and Burnett) "referenced Test 903 at trial when testifying about restraint use during the accident and how the seatback interacted with the seatbelt." As stated earlier, Messrs. Paddock and Burnett took measurements based on the LS's seat belt markings to determine how to position the dummy and seat in Test 903. Plaintiff sought to show how Messrs. Paddock's and Burnett's positioning of the dummy and seat in that test (with the dummy seated upright all the way back in the seat and with the seat nearly all the way back on its rack) contradicted the positioning that Dr. Raddin was relying on to reach his conclusions (with the dummy seated five inches forward in the seat and leaning down with her head

between her knees, with the seat moved forward several inches). During this cross-examination, plaintiff's counsel used Mr. Paddock's deposition to get him to admit that the dummy's seat positioning in Test 903 — which Messrs. Paddock and Burnett had supervised — was "Ford's theory of what happened in this case." Thereafter, counsel repeatedly referred to Test 903 as Ford's theory of the case during his cross-examination of Mr. Paddock. Ford argues that counsel's references violated the in limine order.

This questioning did not violate the in limine order. Plaintiff was entitled to show how the expert opinions of Messrs. Paddock and Burnett as to Kelsey's positioning in the front seat differed dramatically from that positioning hypothesized by Dr. Raddin to reach his conclusions. This was not a case of plaintiff's using the theories of *Dr. Roberts* to contrast them with those of Dr. Raddin; rather, it was plaintiff's using the theories of *Messrs. Paddock and Burnett* to contrast them with those of Dr. Raddin. As Messrs. Paddock and Burnett were employees and representatives of Ford, references to Test 903 — which they helped set up, conduct, and supervise — as Ford's theory of the case would appear to be reasonable and were indeed confirmed as accurate references by Mr. Paddock. These references did not violate the in limine's prohibition against referring to the theories of the absent Dr. Roberts.

(ii) *Referring to the Differences between Test 903 and Dr. Raddin's Conclusions.* Ford next complains that in cross-examining Dr. Raddin, plaintiff's counsel confronted Dr. Raddin with the stark differences between his causative theory[8] and Test 903. Ford claims this violated the order on the motion in limine.

Notably, Dr. Raddin relied on portions of Test 903 to reach his conclusions. Specifically, as conceded in Ford's appellate reply brief, Dr. Raddin "used two still frames from [Test 903] to create a depiction of his theory." Moving Kelsey five inches forward in the front seat and moving the front seat further forward on its rack, Dr. Raddin superimposed an overlay on these frames to conclude that the deployment of the air bag in the front seat caused the air bag to strike Kelsey's back, resulting in her spinal injury. Cross-examining Dr. Raddin to demonstrate the differences between the seat positioning in his theory and the seat positioning which Messrs. Paddock and Burnett had arranged was reasonable and did not reference the theory of Dr. Roberts nor otherwise violate the in limine order.

---

[8] Ford claims Dr. Raddin was its only expert on causation and that therefore this cross-examination using Test 903 was devastating. However, Mr. Burnett also gave causation testimony when he opined that the back seat falling forward would not have produced the injury suffered by Kelsey.

(iii) *Referring to Dr. Raddin as Being Retained Late in the Case.* As its third complaint, Ford claims that plaintiff's counsel inappropriately questioned Dr. Raddin about his services in this case, implying that Dr. Raddin was a late-retained expert hired to develop a theory that could explain Kelsey's injury. However, this cross-examination of Dr. Raddin did not intimate that he was hired late in the case nor in any way reference Dr. Roberts's theories; rather, it simply questioned him as to the amount of time and money he expended and billed in developing his opinion. We fail to see any violation of the in limine order.

(iv) *Referring to Dr. Raddin as Being Hired to Pull the Ox out of the Ditch.* Ford's final complaint is that during plaintiff's closing argument, counsel implied that Ford had a prior theory that was shown to be ineffective and that Ford hired Dr. Raddin to cure the problem. "The ox is in the ditch, and Dr. Raddin appears."

The full context of the argument shows, however, that counsel was simply focusing on the stark reality of Test 903, which demonstrated that with the dummy sitting all the way back in a seat that is located near the end of the rack, the air bag could not have caused any injury to the dummy. The complete argument reads:

> Now we get to Dr. Raddin. Before Dr. Raddin comes into the picture, . . . we have 903. I'm going to show it to you for two reasons. We have 903. Mr. Paddock has taken the dummy and put it in the position that he says all of his work in the case shows that the dummy was in the front seat passenger [seat]. Before anything happened, we have her all the way back. No 5 inches. We have her head upright. We have her just sitting there like, you know, 99.9 percent of the world sits in the front seat. Seat-back all the way back. No 5 inches. She starts coming forward. The [seat belt locking device] that the child described as smoke, etc., has fired. Look at the smoke. She goes into a fully deployed air bag face first, and there is no blow to the back.
>
> At that point, ladies and gentlemen, the ox is in the ditch, because if we take Paddock's seating position, and we take that air bag, Kelsey can't be paralyzed. The ox is in the ditch, and Dr. Raddin appears.

The import of this argument is that the seating position in the front seat as constructed by Mr. Paddock in Test 903 — with the upright dummy not being moved forward — could not have medically produced the compression injury suffered by Kelsey, and that with this "ox in the ditch," Dr. Raddin appeared in the case and superimposed

a supine seating position with the seat and dummy moved forward. We agree with the trial court that this reference did not violate the order in limine.

The fatal flaw in Ford's appellate argument on this enumeration is that the court did not order, nor did Ford request, that plaintiff could not refer to Test 903; indeed, Dr. Raddin *relied* on Test 903 for his overlay and illustrative exhibit to show his theory as to the cause of Kelsey's injuries. It was appropriate for the plaintiff's counsel to cross-examine Dr. Raddin and to comment on the differences between his superimposed overlay (which moved the dummy and the front seat closer to the air bag and changed the seating position of the dummy to a supine position). Ford's contention in its reply brief that plaintiff improperly cross-examined Ford experts about Test 903 is without merit, for in pointing out the differences between Ford's Test 903 and Dr. Raddin's overlay, plaintiff's counsel was careful not to refer to Dr. Roberts or to his testimony or theories or in any other way to violate the in limine order. We discern no error in the trial court's overruling Ford's related objections.

3. In its next enumeration, Ford argues that the trial court abused its discretion in excluding from evidence a sled test that Ford conducted in the middle of trial to support Dr. Raddin's testimony. Ford claims that because of time constraints, Dr. Raddin had not conducted the test prior to trial.

The context of the facts surrounding the decision not to run this test until mid-trial are crucial to understanding the court's decision to exclude the test. The court specially set the trial in this case for February 16, 2004, to accommodate Ford's specific request for that particular date. On December 23, 2003 (eight weeks before trial), Ford filed a motion to continue the trial on the basis that one of its expert witnesses (Dr. Roberts) had been recently diagnosed with a serious medical condition that would preclude his attendance at trial. At that point, Ford was aware of the need for a new expert. The court within two weeks denied the motion to continue. Thus, six weeks prior to trial Ford was aware that it had to obtain a new expert.

Ford retained Dr. Raddin. At his deposition on February 7, Dr. Raddin testified that he had not asked Ford to construct a sled test to test his theory because "I felt like I could arrive at the opinion that I have offered to you today on the basis of the material that I had to review, and so . . . I have not asked them to do it." He testified that he had not discussed the subject with Ford's attorneys. Thus, construing Dr. Raddin's testimony in favor of the trial court's ruling, we affirm the finding that time constraints did not prevent Dr. Raddin from conducting or requesting the sled test; rather, he simply felt the test was unnecessary.

Based on the parties' submissions, the court entered a pretrial order to govern the trial. The pretrial order contained no reference to Ford's attempting to conduct any further tests, and contained clear restrictions limiting documentary evidence to that listed.

During trial, when plaintiff's counsel repeatedly referred to the lack of any such test to support Dr. Raddin's theory, Ford then decided — without any request for such from Dr. Raddin, without any notice to opposing counsel, without any leave of court, without seeking to amend the pretrial order, and without even notifying Dr. Raddin — to conduct a sled test to support Dr. Raddin's theory. Not until plaintiff had closed its case did Ford disclose the test and its desire to submit the test results as evidence. The trial court ruled the surprise test results inadmissible.

During Ford's offer of proof, Dr. Raddin testified that he had had nothing to do with the decision to run the test or with the running of the test. He conceded that he knew of no reason why the test could not have been conducted the week prior to trial. He himself learned of the test on the same day it was disclosed to the court in the middle of trial. He further informed the court that he did not need the test results, especially since they were lacking key numbers to make them useful. At most, the test results would only help illustrate his theory. Accordingly, the court reiterated its ruling to exclude the evidence.

The admissibility of evidence rests within the sound discretion of the court. *Deese v. Carroll City County Hosp.*[9] The belated creation of scientific evidence mid-trial without permission of the trial court or notice to opposing counsel is not a matter of right, and authorizes that evidence's exclusion by the trial court in the exercise of its discretion. In light of the circumstances here, particularly Dr. Raddin's testimony that the test results were unnecessary and only illustrative at best, we cannot say that the trial court abused its discretion in excluding the test evidence.

Ford complains that during closing argument plaintiff's counsel inappropriately argued that there was no sled test that portrayed Dr. Raddin's theory, and that the trial court erred in not granting a mistrial. The record belies Ford's argument. During closing, plaintiff's counsel argued: "There was no pretrial test that would even come close to demonstrating [Ford's theories]." Thus, Kelsey's counsel qualified his argument to refer to pretrial tests, not a sled test. This enumeration, therefore, lacks merit.

4. In its fourth enumeration, Ford claims that the trial court erred in admitting prior consistent statements of two witnesses

---

[9] *Deese v. Carroll City County Hosp.*, 203 Ga. App. 148, 150 (2) (416 SE2d 127) (1992).

whose veracity Ford did not challenge. The record, however, shows that Ford did challenge the veracity of the witnesses.

Kelsey's mother and her sister both testified that Kelsey was riding in the back seat at the time of the accident. The sister further testified that she saw Kelsey crawl to the front seat. Over Ford's objection, the court allowed two witnesses to testify that the mother told them separately within hours of the accident that Kelsey was riding in the back seat with the sister in front. Similarly, the court allowed an officer to testify that while the mother was still in the hospital, the sister told him that Kelsey was in the back seat and that she was in the front when the accident occurred, and that she saw Kelsey crawl to the front seat.

*Woodard v. State*[10] set forth the criteria for admitting prior consistent statements. "[S]uch statements are admissible only where (1) the veracity of a witness's trial testimony has been placed in issue at trial; (2) the witness is present at trial; and (3) the witness is available for cross-examination." Id. "[A] witness's veracity is placed in issue so as to permit the introduction of a prior consistent statement only if affirmative charges of recent fabrication, improper influence, or improper motive are raised during cross-examination." Id.

Acknowledging that the latter two listed criteria were met, Ford claims that plaintiff did not meet the first *Woodard* criterion in that Ford did not place the veracity of either witness in issue. Therefore, Ford claims that the prior consistent statements were inadmissible. We disagree.

Ford clearly challenged the mother's veracity by charging recent fabrication. On cross-examination, Ford asked the mother: "Now, Ms. Sasser, did you or did you not make the statement to [the investigating officer] that Kelsey was in the front seat and [the sister] was in the backseat?" The mother did not remember; Ford presented through deposition the testimony of the investigating officer that the mother indeed did say such. Ford further challenged the mother's veracity, asking: "So your daughter with a broken spine, two fractures to her hip, a subarachnoid hemorrhage, would have to pull herself up through that opening, crawl up over the top of it, and somehow or another get her legs, if she is paralyzed at that moment, to swing around and get down the front way; is that right?" The mother agreed. Finally, during the mother's cross-examination, Ford insinuated that the mother fabricated her testimony after hiring a private investigator.

---

[10] *Woodard v. State*, 269 Ga. 317, 320 (2) (496 SE2d 896) (1998).

Similarly, Ford challenged the sister's veracity as recent fabrication. During her cross-examination, Ford asked: "When your dad got there [to the scene of the accident], you did tell your dad you were in the backseat when the collision occurred; is that right?" The sister confirmed that she had said such as a result of her concern that the father would otherwise be angry, since he preferred that she not ride in the front seat. Ford pressed further, asking twice whether she had told three other people that she had been in the back seat, to which she responded, "No, ma'am." Ford also challenged as recent fabrication her testimony about witnessing the crawling, pointing out that she had not told her father about this and that she may have felt so uncomfortable about the truthfulness of the testimony that she had not told others. Ford also got the sister to concede that she had never before seen Kelsey crawl to the front seat in this way.

Although the challenge to the witness's veracity need only be implied, *Johnson v. State*,[11] here the challenges were express. From Ford's opening statement in which it claimed that the mother and sister had "switched" their stories (cf. *Shields v. State*[12] ("both the cross-examination *and the opening statement* by the defense implied that the [witness's testimony was] improperly motivated") (emphasis supplied)), to the cross-examination of the witnesses, to its presenting contradicting statements by the witnesses, Ford sought to portray these two witnesses' trial testimony as recent fabrication designed to advance Kelsey's cause. The trial court did not abuse its discretion in admitting the prior consistent statements of the mother and of the sister.

5. In its fifth enumeration, Ford argues that the trial court erred in denying its motion for j.n.o.v. on the issue of punitive damages. Ford claims no evidence supported a finding that its actions met the punitive damage criteria.

Admitting its burden to present clear and convincing evidence, plaintiff sought punitive damages under OCGA § 51-12-5.1 (b) only on the theory that the defendant's actions showed that entire want of care which would raise the presumption of conscious indifference to consequences. The appellate standard of review on the denial of a motion for j.n.o.v. is whether any evidence supports the verdict. *Blanton v. Bank of America.*[13] " '[U]nder a clear and convincing evidence standard there must be substantial evidence to constitute "any evidence" to support a verdict under such intermediate standard

[11] *Johnson v. State*, 241 Ga. App. 448, 451 (3) (526 SE2d 903) (1999).

[12] *Shields v. State*, 264 Ga. App. 232, 237 (2) (590 SE2d 217) (2003).

[13] *Blanton v. Bank of America*, 256 Ga. App. 103, 104 (567 SE2d 313) (2002).

of proof; a scintilla or slight amount of evidence would not satisfy such a higher standard of proof.' " Id. at 105.

The following evidence supported a finding that Ford's actions showed that entire want of care which would raise the presumption of conscious indifference to consequences:

(a) Throughout the years of its pre-production of the LS vehicle, Ford keenly recognized the safety problems inherent in an unlatched back seat. A falling back seat would impair the effectiveness of the seat belt operation and would result in greater injury to the occupant. Acknowledging this as a "very important" safety issue, Ford nevertheless chose not to warn its customers about the enormous problems it experienced in the back seat latching systems in its LS vehicles. Nor did Ford run any dummy "sled" tests on vehicles in which the back seat was unlatched. Following the accident in this case, a Ford engineer wrote an email to Ford management that the LS latch had been bedeviled with problems for years and posed a "safety issue" for the public.

(b) Because of the danger inherent in an unlatched back seat, Ford in various pre-production internal documents discussed the need to ensure that its customer would be aware if the back seat was not latched. In a 1993 document, Ford acknowledged that those Ford vehicles having a built-in child seat should have a "flag indicator" system (cost of $3 per vehicle) that would have a red indicator visible on the top of the seat if the back seat was not fully latched. At this time, Ford also developed an interlock system (cost of $10 per vehicle) that connected the seat latches to the built-in child seat and did not allow the child seat to open unless the seat back was latched. A 1995 internal Ford document proposed that all back seats "should have a device to prevent use of the seat belt by a centre occupant if the seat back is not fully latched. A visible indication that the seat latch is unlatched shall also be provided. This should be visible to rear seat occupant in an otherwise unoccupied vehicle." Nevertheless, Ford chose not to adopt such a warning system in its 2000 LS vehicle.

(c) Ford engineer John Pinkerton testified that in the years before the Lincoln LS was released to the public, Ford experienced numerous problems with the safety latch system for the back seat on this vehicle not working properly in pre-production models. For example, he testified as to problems in prototype vehicles:

Q. Approximately two years before the vehicle was launched to the public, Ford discovered that there were certain vehicles where the latches were not engaging properly, true?
A. Correct.
Q. And Ford discovered these problems in prototype vehicles, correct?

A. Correct.

Based on Ford documents and his own experience, Mr. Pinkerton concluded that "in the period of time leading up to the launch of the LS in 1999, there were numerous problems that Ford encountered in getting the latches to work properly on the prototype vehicles." Because of the problems, Mr. Pinkerton conceded that Ford engineers "requested a deviation from Ford's internal standards" so that production of the vehicle could go forward nevertheless.

(d) At the time the vehicle was launched, the issue was still unresolved, even though the latching of the back seat was integral for the back seat occupant's safety during a crash. Mr. Pinkerton admitted:

Q. Ford's internal standards require, do they not Mr. Pinkerton, that if there is a latch on a fold-down seat, that latch has to latch?
A. Absolutely.
Q. And you would agree with me, would you not sir, that the seat system and restraint system are integral for providing for the safety of an occupant in a crash?
A. Absolutely. *They are interdependent and very important for the occupant's safety.*
Q. And one of the primary purposes of the seat system in the LS was to interface or to work with the restraint system, correct?
A. Absolutely.
Q. And it would be unacceptable, would it not sir, if a Ford customer like Rhonda Sasser received a Lincoln LS where the rear seat back latch did not work properly?
A. Absolutely unacceptable.

(Emphasis supplied.)

(e) Ford engineer Steve Mitchell testified that after the vehicle was released to the public, there were extensive complaints from Ford consumers, Ford auditors, Ford assembly line personnel, and various Ford employees regarding the poor performance of the LS latches. Specifically, the evidence showed:

(i) Shortly after the LS vehicle was released to the public in 1999, there were hundreds of complaints from Ford consumers — including 646 warranty claims relating to the 2000 model year version alone — who were having difficulties in getting the back seat latches to properly latch. Most of these claims were that the seat would not latch at all.

(ii) Eight months after the LS vehicle was released to the public, assembly line inspectors continued to discover a large number of vehicles on the assembly line where the back seat latch would not latch properly.

(iii) Ford field auditors, Ford employees leasing the vehicle, and Ford testing employees discovered the same problem on numerous LS vehicles. Even a member of Ford's legal team that purchased the vehicle conceded that the seat in the lawyer's vehicle could not be latched.

(iv) This latch assembly became one of the top failure modes for the 2000 model year LS (the model year of the LS in which Kelsey rode).

(f) Even though Ford was aware of the latching problem, Ford consciously chose not to send any warning out to consumers or to adopt an interlock system that would alert drivers when the back seat was not latched.

(g) Federal Motor Vehicle Standard No. 207 required that fold-down seats "be equipped with a self-locking device for restraining the hinged or folding seat or seat back." Ford's expert and employee Mr. Burnett and Mr. Pinkerton testified regarding the standard:

(i) when an occupant pushes a fold-down seat up, it must automatically lock in place;

(ii) if the seat does not latch, it violates 207;

(iii) if the seat does not self-latch automatically, it violates 207;

(iv) if the seat cannot be made to latch, it violates 207;

(v) Standard 207 requires both strength and self-latching;

(vi) Ford did no testing to determine whether the self-latching requirement was met;

(vii) Ford did no sled testing or crash testing with the seat unlatched or an occupant belted in the seat to see what would happen. Mr. Burnett conceded that the noted federal violations were found in the 2000 model year Lincoln LS vehicle because the back seat often did not self-latch.

(h) Prior to the accident, numerous Ford internal documents described problems with the latch striker loop on the LS not penetrating deep enough into the receiver to engage the latch. Ford's own micro camera analysis of the Sasser latch established that this was the same problem that caused the Sasser latch not to work properly.

(i) Because of problems with the latch system, Ford changed the design on future model LS vehicles one month before the Kelsey accident and discussed in a high-level committee whether to recall the 2000 LS. No warning went out to consumers, even though Ford witnesses conceded that the latch system was a safety system and affected the performance of the safety belts, and that its failure would cause an occupant of an LS vehicle to suffer greater injury in a crash.

The entire want of care shown by this conduct is reflected in the statement of Ford's Mr. Burnett, who admitted: "[W]ith a safety concern, we can't wait on safety."

Under this evidence, Ford for years was keenly aware of the latching problem with the back seat based on hundreds of reports from both internal and external sources. Because this affected the operation and integrity of the seat belt system, Ford believed that this problem posed a significant danger to Ford's customers, who were admittedly more likely to suffer greater injury if the back seat latch were not attached or otherwise failed. Despite this knowledge, its recommendation for a red indicator to alert customers to an un-latched seat, and its own concerns that a recall may be in order, and despite its intent to change the design of the latching system to remedy this acknowledged safety defect, Ford chose to do nothing to warn consumers such as Kelsey's mother of the danger or to other-wise alert them to the need to check the possibly unlatched back seat securing device. Thus, Ford was aware of the possibility of a tragic accident like Kelsey's occurring, but decided not to alert the public to this danger. A jury was authorized to find such conduct callous and wanton, constituting an entire want of care showing conscious indif-ference to consequences.

As substantial evidence supported a clear and convincing finding of the requisite entire want of care, the trial court did not err in denying Ford's motion for j.n.o.v. See *Zeigler v. Clowhite Co.*[14]

6. In its sixth enumeration, Ford argues that plaintiff is not entitled to any post-judgment interest on the judgment entered against Ford. Ford reasons that the current applicable statute — OCGA § 7-4-12, which provides for an interest rate at the prime rate plus three percent — applies only to actions filed on or after July 1, 2003. See OCGA § 7-4-12 (d). The current version of the statute, however (including new subsection (d) referencing the July 1, 2003 date) is a 2003 amendment[15] of former OCGA § 7-4-12, which pro-vided that all judgments in Georgia would bear interest upon the principal amount recovered at the rate of 12 percent per year (ex-cepting certain judgments on written contracts). Inasmuch as the amended version of the statute does not apply to this case, the former unamended version in effect at the time of the filing of plaintiff's action does; accordingly, the court did not err in ordering that the judgment would bear interest at the rate of 12 percent per year.

*Judgment affirmed. Ellington and Bernes, JJ., concur.*

---

[14] *Zeigler v. Clowhite Co.*, 234 Ga. App. 627, 630 (3) (507 SE2d 182) (1998).
[15] See Ga. L. 2003, p. 820, § 1.

DECIDED JULY 1, 2005 —
RECONSIDERATION DENIED JULY 15, 2005 —

*Sutherland, Asbill & Brennan, Teresa W. Roseborough, Deborah M. Danzig, Kristen H. Glover, Owen, Gleaton, Egan, Jones & Sweeney, W. Seaborn Jones, Philippa V. Ellis, Richard J. Baker*, for appellant.
*Scherffius, Ballard, Still & Ayres, Andrew M. Scherffius III, Tamara M. Ayres, Jeffrey R. Harris, Butler, Wooten, Fryhofer, Daughtery & Crawford, Jason L. Crawford*, for appellee.